IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

PPC BROADBAND, INC.                                                      PLAINTIFF

v.                                    Case No. 4:22-cv-00163-LPR

PERFECTVISION MANUFACTURING, INC.                                    DEFENDANT

## ORDER

This is a patent-infringement case.  Plaintiff PPC Broadband, Inc. ("PPC") is the owner of the "Bence Patents," which are a set of five Patents pertaining to the design of a coaxial cable connector.  Defendant PerfectVision Manufacturing, Inc. ("PVM") is allegedly infringing on those Patents.  We are at the claim-construction stage.  The parties dispute the meaning of certain words and phrases found in the claims of the Patents.  So the Court is tasked with resolving those disputes in this Order by "construing" the Patents.  The Court also addresses PVM's arguments that several of the disputed terms are indefinite and therefore any claims containing those terms are invalid.

## BACKGROUND

The Bence Patents are a single, continuous family of five patents: U.S. Patent No. 7,114,990 ("the '990 Patent"), U.S. Patent No. 7,479,035 ("the '035 Patent"), U.S. Patent No. 7,955,126 ("the '126 Patent"), U.S. Patent No. 8,172,612 ("the '612 Patent"), and U.S. Patent No. 10,756,455 ("the '455 Patent").  While the claims across these five Patents are slightly different, the same embodiments and figures are used in each Patent.[1]  This Background Section provides an overview of the main aspects of the Bence Patents.  A more detailed account of specific

---

[1] For the sake of conciseness, and because the embodiments and figures are the same across each of the five Patents, the Court will cite to the '990 Patent whenever it cites to the embodiments and figures in this Order.  Nonetheless, when the Court discusses the construction of a disputed term in a specific claim, the Court will refer to the specific claim and the specific patent at issue.

embodiments and claims will be provided later in this Order—as and when they become relevant to the construction of a particular disputed term in a particular claim or claims.

## I.   Overview of the Technology Involved in the Bence Patents

A coaxial cable is a type of cable that provides a path for the transmission of electrical signals.[2]  It is composed of a center conductor, dielectric material, and an outer conductor.[3]  The center conductor transmits the electrical signal.  The dielectric material surrounds the center conductor and acts as an insulator.  And the outer conductor is maintained at ground potential and surrounds both the center conductor and the dielectric material.[4]  All of these parts of the cable are encased in a plastic cable jacket for protection.[5]

One of the most common uses of coaxial cable is the provision of cable television services via the cable's connection to a port on the back end of a cable box.[6]  In order to connect the cable to the port, the end of the cable must first be affixed to the back end of a coaxial cable connector.  It is this coaxial cable connector that is the subject of the Bence Patents.

To connect the cable to the connector, the end portion of the cable jacket is stripped off to bare the end portion of the outer conductor.[7]  The cable then slides into the back end of the outer body of the connector.[8]  The outer body of the connector has a tubular post inside of it which

---

[2] U.S. Patent No. 7,114,990, col. 1 ll. 16–17 (filed Jan. 25, 2005) [*hereinafter* '990 Patent].

[3] '990 Patent, col. 1 ll. 16–26; Pl.'s Claim Construction Br. (Doc. 33) at 3–4 (hereinafter using the page numbers at the bottom of the page that correspond to the parties' briefing pagination).

[4] The Court understands "ground potential" to mean forming a ground path that "shield[s] the signal transmitted by the center conductor from stray noise . . . ." '990 Patent, col. 1 ll. 20–22.  Essentially, the ground potential of the outer conductor acts as a barrier that prevents external electrical interference.

[5] '990 Patent, col. 1 ll. 16–26; Pl.'s Claim Construction Br. (Doc. 33) at 3–4.

[6] *See* '990 Patent, col. 1 ll. 11–14; Pl.'s Claim Construction Br. (Doc. 33) at 4.

[7] '990 Patent, col. 1 ll. 26–36.

[8] '990 Patent, col. 1 ll. 33–46.

receives the prepared end of the cable between the dielectric material and the outer conductor.[9]
With the cable successfully inserted inside of it, the connector is then attached to the port.  That
attachment is done by threading a rotatable coupling nut[10] on the front end of the connector onto
the appliance port.[11]

If you had to read the last paragraph more than once, do not fear.  The Court is sure that
you are not alone.  For that reason, and because a picture is worth a thousand words, the Court will
(in this Background Section) rely heavily on general depictions of the technology.  For example,
it is helpful to look at Figure 3 from the Bence Patents.[12]



*FIG. 3*

The coaxial cable (301) is shown prior to insertion into the back end of the connector (103).
305 is the cable jacket.  304 is the outer conductor.  303 is the dielectric material.  And 302 is the
center conductor.  The tubular post (which should be labeled "104" but is mistakenly labeled "102"

---

[9] *Id.*

[10] The "coupling nut" is also referred to as just the "nut" or the "coupler" throughout the record and this Order.  The
parties and the Court use these terms interchangeably to refer to the same part of the connector.

[11] '990 Patent, col. 1 ll. 43–59.

[12] '990 Patent, fig. 3.

and appears on the bottom right-hand side of Figure 3[13]) is contained inside the outer body (108) of the connector and is ready to receive the stripped end of the cable between the dielectric material (303) and the outer conductor (304).  The coupling nut (105) is at the front of the connector and is ready to be threaded onto a port on the back end of a cable box.

The cable-box port has its own outer conductor.  If the coupling nut of the coaxial cable connector (105) is fully and properly tightened onto the cable-box port, the head of the tubular post in the connector (104) makes direct contact with the outer conductor of the cable-box port.[14] Because the other end of the tubular post is connected to the outer conductor of the coaxial cable upon the cable's insertion into the connector, the tubular post acts as an electrical bridge between the outer conductor of the coaxial cable and the outer conductor of the cable-box port.  Thus, an electrical connection between the outer conductor of the coaxial cable and the outer conductor of the cable-box port is formed.[15]

This outer-conductor connection is important because the outer conductor (when electrons are properly flowing) shields the center conductor from electrical interference from other cables that would weaken the signal quality of the center conductor.[16]  Similarly, the outer conductor (when electrons are properly flowing) also prevents signal leakage from the center conductor, which could otherwise interfere with other cables.[17]  In short, the electrical bridge that is formed between the outer conductor of the coaxial cable and the outer conductor of the cable-box port acts

---

[13] Figure 3 contains two "102" labels.  Clearly, this is a scrivener's error.  The 102 label on the right-hand side of Figure 3 correctly identifies the front end of the connector.  The 102 on the bottom right-hand side of Figure 3 is actually the tubular post and should be understood as a reference to "104."  This is clear from the '990 Patent's Description of the Preferred Embodiment, which consistently labels "102" as the "front end" of the connector, and "104" as the "tubular post."  *See, e.g.,* '990 Patent, col. 5 ll. 43–46; col 6 ll. 1–65; col. 7 ll. 2–23.

[14] '990 Patent, col. 1 ll. 43–59.

[15] *Id.*

[16] *See* June 29, 2023 Hr'g Tr. Pt. I (Rough) at 7–10.

[17] *See id.*

as a two-way shield preventing signal interference.  That's one reason the coaxial cable connector is such an important product.

A common problem with these connectors, however, is that in many cases the coupling nut is not fully tightened onto the cable-box port.[18]  This may be for a variety of reasons.  Sometimes the installer is unable to fully tighten the coupling nut because the port is in a place that is difficult to reach.  And even when the connector is properly installed, it can loosen over time.  Regardless of the reason, when the coupling nut is not fully drawn onto the port, a gap exists between the head of the tubular post (104) and the outer conductor of the cable-box port.[19]  Without an alternate ground path, this gap causes a break in the electrical bridge between the outer conductor of the cable and the outer conductor of the cable-box port.  In turn, this allows external electrical signals to interfere with the center conductor, which ultimately causes poor signal quality.[20]  And when customers experience poor signal quality, they often require their service provider to send a technician to diagnose and fix the problem.  These technician visits turn out to be a significant drain on profitability for the service provider.[21]

The Bence Patents present a solution to this issue.  Indeed, the main object of the invention is to create a connector "which ensures a reliable ground connection between the tubular post of the connector and an outer conductor of the appliance port, even if the coupler is not fully tightened onto the appliance port."[22]  (The Patents refer to the cable-box port as an "appliance port."  The Court will use the term "cable-box port" and the term "appliance port" interchangeably.)  To

---

[18] '990 Patent, col. 1 l. 60–col. 2 l. 3.

[19] *Id*.

[20] *Id*.

[21] Pl.'s Claim Construction Br. (Doc. 33) at 6.

[22] '990 Patent, col. 2 ll. 46–49.

accomplish its objective, the preferred embodiment states that "a resilient, electrically-conductive grounding member [is] disposed between the tubular post and the coupling nut"[23] on the coaxial cable connector.  According to the Patents, the grounding member engages "both the tubular post and the coupling nut [to] provid[e] an electrically-conductive path therebetween, but without restricting rotation of the coupling nut relative to the tubular post."[24]  The idea appears to be that, with such a design, even if the tubular post loses contact with the outer conductor of the cable-box port, the ground path can still flow from the tubular post through the grounding member, and then through the coupling nut to the cable-box port.[25]  And, according to the Patents, because the grounding member is resilient, it can bend and flex such that it always maintains contact between the post and the coupling nut without restricting the rotation of the coupling nut.

The following two images from the specification purport to show how the grounding member fits in the connector.[26]  The tubular post is blue. The coupling nut is green. The center conductor of the coaxial cable is orange.  The grounding member is red in Figures 11D and 11A, but is too small to be shown as a color in Figures 5 and 5A.  In those figures, it is denoted by the number 110.  The top image shows the connector already fully rotated onto the cable-box port.  That means the white space above and below the center conductor (orange) and in between the coupling nut (green) is the cable-box port.

---

[23] '990 Patent, col. 5 l. 67–col. 6 l. 2.

[24] '990 Patent, col. 6 ll. 8–11.

[25] '990 Patent, col. 5 l. 62–col. 6 l. 2.  The Court notes that the coupling nut itself is made of conductive material. *See* June 29, 2023 Hr'g Tr. Pt. I (Rough) at 11.

[26] '990 Patent, fig. 5, fig. 5A, fig. 11A, fig. 11D.  Throughout this Order, the Court includes figures from the Patents with portions highlighted in different colors for clarity.  Although the figures in the Patents are black and white, the Court finds that the highlights aid its discussion.  The Court notes that beyond the addition of highlights, there are no other substantive differences between the highlighted figures and the black-and-white figures.



FIG. 5A        FIG. 5



FIG. 11A        FIG. 11D

In Figure 5, the grounding member (110) is disposed between the coupling nut (green) and the tubular post (blue) and always maintains contact with both. Figure 11D is one example of the design of the grounding members in the Bence Patents. Figure 11A shows a zoomed-in picture of that grounding member (red) contacting the tubular post (blue) and the coupling nut (green). The grounding member (red) has projections (1117) that extend out and contact the coupling nut (green) while also maintaining contact with the tubular post (blue).

The grounding member (red) is described in different ways across the preferred embodiment and six alternate embodiments in the Bence Patents. For example, with respect to its shape, the grounding member is variously described as "generally arcuately shaped," "generally circular," "in the form of a generally circular broken ring, or C-shaped member," "preferably

oblong," "a circumferential metallic band," approximating the shape of a "hollow cylinder," and having "an arc of at least 225°, and may[be] extend[ing] for a full 360°."[27]  As to its composition, the grounding member is made preferably of metallic material (although in one embodiment it is made of conductive grease) with a diameter between 0.010-inch and 0.020-inch.[28]  There are also variations regarding how the grounding member maintains contact between the post and the coupling nut.  For example: In one embodiment the grounding member has a "plurality of projections" either extending outwardly or inwardly;[29] in another embodiment, the grounding member has a "plurality of fingers" that project at an angle from the ring;[30] and in yet another embodiment, the grounding member has multiple "external lugs" and "internal lugs."[31]

## II.    History of the Bence Patents

On or about April 27, 2021, PPC became the owner of the Bence Patents by assignment from Corning Optical Communications RF LLC ("Corning").[32]  But this was not PPC's first involvement with either Corning or the Bence Patents.  Let's rewind the tape nearly a decade.

On October 15, 2012, Corning filed a complaint against PPC for patent infringement in the United States District Court for the District of Arizona.[33]  Corning alleged that PPC's connectors infringed two of the Bence Patents—the '990 Patent and the '612 Patent.[34]  That litigation ended on January 10, 2017, pursuant to a Joint Stipulation of Dismissal.[35]  But certain events in that

---

[27] '990 Patent, col. 3 ll. 22–29, col. 9 ll. 22–24.

[28] '990 Patent, col. 6 ll. 31–36, col. 9 ll. 52–54.

[29] '990 Patent, col. 3 ll. 46–52.

[30] '990 Patent, col. 8 ll. 33–34.

[31] '990 Patent, col. 8 ll. 51–59.

[32] Def.'s Counterclaim ¶ 19; Pl.'s Answer to Counterclaim ¶ 19.

[33] Def.'s Counterclaim ¶ 20; Pl.'s Answer to Counterclaim ¶ 20.

[34] Def.'s Counterclaim ¶ 22; Pl.'s Answer to Counterclaim ¶ 22.

[35] Order (Doc. 124), *Corning Optical Communications RF LLC v. PPC Broadband Inc.*, No. 2:12-cv-02208-SMM.

litigation may well be important to the instant case. Specifically, in that litigation, the District Court held a claim construction hearing and issued a claim construction order. As will be discussed in more detail below, the positions PPC took as to the constructions of certain terms and the decision made by the District Judge in Arizona construing those terms may bind PPC in the instant case.

In any event, on February 18, 2022, as the now-owner of the Bence Patents, PPC sued PVM for patent infringement.[36] PPC alleges that PVM's connectors infringe claims in all five of the Bence Patents.[37]

## DISCUSSION

Whether PVM is liable for patent infringement is a question of fact.[38] That means a jury is responsible for deciding whether PVM's creation and sale of certain coaxial cable connectors is unlawful because those connectors fall within the scope of the Bence Patents. But to know whether the connectors are covered by a patent claim, a jury must first know what the words of that patent claim mean. And the parties to a patent-infringement suit rarely agree on the meaning of a patent claim. The Supreme Court, in *Markman v. Westview Instruments, Inc.*, held that judges, not juries, are responsible for resolving disputes as to the meaning of a patent claim.[39] A judge resolves such disputes through claim construction. The judge's constructions are the foundation for the jury instructions that will be used to determine whether, as a matter of fact, infringement has occurred.[40]

---

[36] Compl. (Doc. 1).

[37] *See id.* at ¶ 1.

[38] *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010).

[39] 517 U.S. 370, 372 (1996).

[40] *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022) ("A proper claim construction provides a legal standard for the jury to apply . . . .").

The Court's job at the claim-construction stage is to discern the "ordinary meaning" of the disputed patent claims.[41]  "Ordinary meaning" is a phrase that frequently appears in caselaw.  It is most often invoked by courts when interpreting a statute.[42]  In that context, a term's "ordinary meaning" is the meaning that a regular member of the public would have given it when the statute was adopted.  The claim-construction analysis is similar, but with a twist.  Here, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ."[43]

Claim construction of course begins with the words of the claim.  But the claims cannot be read in isolation.  The claims "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."[44]  Accordingly, "the person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification."[45]  Indeed, the specification "is the single best guide to the meaning of a disputed term."[46]  That's because the specification, through the embodiments and experiments, provides the strongest evidence of how the patentee viewed the invention.[47]

It is also important to confirm the way in which a patent was understood by the patentee and PTO, which in turn sheds light on how the patent would be read by a person of ordinary skill

---

[41] *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1332 (Fed. Cir. 2022).

[42] *See, e.g.*, *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.").

[43] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Teva Pharms. USA v. Sandoz, Inc.*, 574 U.S. 318, 330 (2015) ("Statutes, in general, address themselves to the general public; patent claims concern a small portion of that public.").

[44] *Phillips*, 415 F.3d at 1315 (internal quotation marks and citation omitted).

[45] *Id.* at 1313.

[46] *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

[47] *See supra* notes 16–20 and accompanying text.

in the art.[48]  In this sense, courts resort to prosecution history to double-check their constructions.[49]

Prosecution history can also reveal that a claim's scope is "narrower than it would otherwise be."[50]

This narrowing is the result of a "prosecution history disclaimer."[51]  A disclaimer occurs "when

the patentee unequivocally and unambiguously disavows a certain meaning to obtain a

patent . . . ."[52]  There's a high bar to establishing a disclaimer: The "disavowing actions or

statements made during prosecution [must] be both clear and unmistakable."[53]  But if that high bar

is cleared, then the patentee is precluded "from recapturing through claim interpretation specific

meanings disclaimed during prosecution."[54]

    A patent and its prosecution history are "intrinsic evidence."[55]  Intrinsic evidence is usually

sufficient to arrive at the proper construction of a patent claim.[56]  There are times, however, where,

after reviewing all of the intrinsic evidence, ambiguities remain.  In those cases, courts may turn

to "extrinsic evidence," which is "all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises."[57]  When possible, it's

best to avoid extrinsic evidence.  It is just as likely to complicate as it is to clarify.  There are often

fights about which extrinsic sources are worthy of consideration and exactly how the chosen

---

[48] *See Phillips*, 415 F.3d at 1317.

[49] *See Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 739 (Fed. Cir. 2014).

[50] *Phillips*, 415 F.3d at 1317.

[51] *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1348 (Fed. Cir. 2020).

[52] *Aylus Networks. Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting *Biogen Idec, Inc. v. GlaxoSmithKline, LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).

[53] *Id.* at 1359 (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed Cir. 2003)).

[54] *Id.* (quoting *Omega Eng'g*, 334 F.3d at 1323).

[55] *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1361–62 (Fed. Cir. 2018) ("A patent's specification, together with its prosecution history, constitutes intrinsic evidence . . . ." (footnote omitted)).

[56] *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 705–06 (Fed. Cir. 1997).

[57] *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).

sources should be applied to the terms at issue.  Moreover, using extrinsic evidence muddies the waters as to whether a judge is weighing evidence and factfinding or performing the legal function of interpreting a document.[58]  The point here is that extrinsic evidence comes inside a break-glass-in-case-of-emergency package with a use-with-extreme-care warning label.

Sometimes, even when "viewed in light of the specification and prosecution history," and even after all intrinsic and extrinsic evidence is considered, a patent claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."[59]  In that case, the claim is "indefinite" and is invalidated.  The indefiniteness inquiry begins with the same general mode of analysis as just described for claim construction purposes.[60]  The burden of proof is on the party challenging patent validity on indefiniteness grounds.[61]

With the foregoing principles in mind, the Court now turns to the disputed terms in the Bence Patents' claims.  There are 25 terms at issue.[62]  The Court addresses the terms in the same order that they were presented in the Joint Claim Chart, in the parties' briefing, and at the *Markman* hearing.

## I.    "a coupler having a first end rotatably secured over the second end of the tubular post"

The term at issue is "a coupler having a first end rotatably secured over the second end of the tubular post."[63]  Recall that the coupler (also called the coupling nut) is the end piece of the

---

[58] *See Teva Pharms.*, 574 U.S. 331–32, 318 (holding that a court's analysis of intrinsic evidence is "a determination of law," while analysis of extrinsic evidence is a "subsidiary factual finding[]").

[59] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

[60] *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022); *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019).

[61] *Bosch Auto. Serv. Solutions, LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017).

[62] There were 26 terms in the Joint Claim Chart, but the parties agree that no construction is necessary for one of them. That term is the 14th term in the chart, "angled radially outward."  Joint Claim Chart (Doc. 31) at 5.

[63] Joint Claim Chart (Doc. 31) at 2.

connector that threads onto the cable-box port, and that the body of the connector has a tubular post inside of it which receives the stripped end of the coaxial cable.[64]   At a superficial level, the parties agree to a construction of the term at issue.   That construction is the same construction that was adopted in the previous litigation in the United States District Court for the District of Arizona ("the Arizona Court"): a coupler having a first end "rotatably secured over the second end of the tubular post by attachment to the body in a manner that allows the coupler to rotate."[65]   But, to mix metaphors, the mirage of an agreement dissipates once one scratches beneath the surface.

PVM argues that, although the parties agree on the words of the construction, they disagree on the meaning of those words.   Thus, to help clarify the meaning of those words, PVM requests that the Court add to the construction "as construed and explained in Section 1(A) of the court's claim construction ruling in *Corning Gilbert Inc. v. John Mezzalingua Assocs. Inc.* . . . ."[66]   PVM argues that this addition is necessary because, despite agreeing on the ultimate construction adopted by the Arizona Court, PPC rejects some of the key reasoning employed by the Arizona Court in reaching that construction.   Chiefly, PVM maintains that PPC rejects the Arizona Court's statements that "the coupler must be attached to the body" and that "it is not possible for the Plaintiff's patent to cover a connector wherein the coupler is not attached to the body member."[67]   According to PVM, PPC is implicitly rejecting these statements because PPC asserted infringement against PVM despite PVM's connector allegedly having a coupler attached to the post and not the body.[68]   But—again according to PVM—PPC, having successfully convinced the

---

[64] '990 Patent, col. 1 ll. 33–46.

[65] Joint Claim Chart (Doc. 31) at 2.   In the Arizona case, the Court was construing the term "rotatably secured over the second end of the tubular post."   Def.'s Counterclaim ¶ 30; Pl.'s Answer to Counterclaim ¶ 30.

[66] Joint Claim Chart (Doc. 31) at 2.

[67] Def.'s Claim Construction Br. (Doc. 32) at 9.

[68] *Id.* at 10.

Arizona Court of those statements, is judicially estopped from arguing otherwise in the present litigation.[69]

PPC argues that PVM is attempting to get the Court to rule on infringement at the claim construction stage.  PPC says the dispute on this claim boils down to the fact question of whether PVM's design has a coupler that attaches to the body or not.[70]  While PPC is right that such a dispute is an infringement question for the jury, the Court does not agree that this is the actual dispute currently before the Court.  The Court does not understand PVM to be making an infringement argument.  Rather, the Court understands PVM's argument to be that there is still disagreement between the parties over what "attachment to the body" means, which is a question for the Court to decide.  And PVM is simply bringing up the infringement issue as evidence of this disagreement.

Nonetheless, PPC is correct that adopting entire sections of a prior court's claim construction opinion into the current construction is not the appropriate solution.  The Court's job at the claim construction stage is to define terms, not to incorporate pages of legal reasoning from a prior case to clarify the meaning of terms.  So the Court will define those terms now, taking into account the intrinsic evidence as well as the reasoning of the Arizona Court.

The crux of this dispute revolves around what the Arizona Court meant by "attachment to the body."  PPC argues that the coupler merely maintaining contact with the body is sufficient, seemingly even if the coupler is ultimately secured directly to the post or some other portion of the connector.[71]  PVM argues that attachment to the body means the coupler must be secured

---

[69] *Id.* at 14–17.

[70] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 2–3.

[71] *See* June 29, 2023 Hr'g Tr. Pt. I (Rough) at 22–26; Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 3–5.

directly to the body, not merely maintain contact with the body.[72]  Thus, PVM's view is that a coupler that is secured directly to the post or any other portion of the connector—even if the coupler still maintains some contact with the body—is outside of the scope of this claim.[73]

A helpful starting place in resolving this dispute is the Arizona litigation itself.  In that case, PPC argued that the Arizona Court should add "by attachment to the body in a manner that allows the coupler to rotate."[74]  PPC's view was that the coupler "has to be secured to the body" and the claims do not cover a coupler secured to the post.[75]  Its argument went as follows.  The only possible way to attach a coupler to a connector is to attach it to either the post or the body (or perhaps both).  But if the coupler was secured to the post and not the body, the coupler would come out of contact with the body, which would violate a different limitation in the Patents.  So, the coupler must be secured to the body.[76]  In its Order, the Arizona Court adopted this portion of PPC's construction.  Here was the Arizona Court's rationale.

> The Court does agree, however, with [PPC's] argument that the claim language, together with the specifications and diagrams, lead to the conclusion that the coupler must be attached to the body—not because of the "free rotation" language, but because of a separate portion of the claim which specifies that the body member contacts the coupler.  As [PPC] notes, section (c) of Claim 29 of the '990 Patent specifies that the body member contacts the coupler.  [PPC] correctly points out that due to the construction of Plaintiff's connecter, wherein the tubular post moves axially with respect to the rest of the connector, if the coupler were secured directly to the tubular post and not the body member, the coupler would have to move with the post, which would take it out of contact with the body in violation of the limitation that the body member contacts the coupler. . . . [i]t is not possible for Plaintiff's patent to cover a connecter wherein the coupler is not attached to the body member.[77]

---

[72] *See* June 29, 2023 Hr'g Tr. Pt. I (Rough) at 30–31.

[73] *See id.*

[74] Ex. C to Def.'s Claim Construction Br. (Doc. 32-3) at 5.

[75] Ex. F to Def.'s Claim Construction Br. (Doc. 32-6) at 52:18–19.

[76] *Id.* at 50:19–24, 52:18–19, 53:6–10, 83:18–19.

[77] Ex. G to Def.'s Claim Construction Br. (Doc. 32-7) at 7–8 (internal citation omitted).

In essence, the Arizona Court accepted PPC's argument that the coupler "must be attached to the body."  And it did so for a reason PPC advanced.  If the coupler was secured directly to the tubular post only and not the body member, the coupler would come out of contact with the body, which would violate a different limitation in the Patents.

From this reasoning three things are clear.  First, the Arizona Court thought that the coupler could never lose contact with the body.  Indeed, its primary rationale for adopting the construction it did was because a contrary construction would result in the coupler and body losing contact.  Second, the Arizona Court thought "attachment" meant more than merely maintaining contact.  In its reasoning, the Arizona Court said that because the coupler couldn't be "secured directly to the tubular post and not the body member," it had to be "attached" to the body.  Thus, it is evident that the Arizona Court was equating being "attached" with being "secured directly to."  Third, the Arizona Court made explicit that the coupler could never be secured directly to the post and not the body.

This Court agrees with the Arizona Court's analysis.  Indeed, this Court thinks that conclusion is further bolstered by the specification, which makes clear that the "the coupling nut is rotatably secured . . . via a neck of the body" rather than to the post.[78]  However, the Arizona Court's construction failed to fully incorporate all of the key aspects of its reasoning.  Instead, a more fitting construction is: [a coupler having a first end] "rotatably secured over the second end of the tubular post and secured directly to the body (as opposed to secured directly to the post only) in a manner that allows the coupler to rotate and that does not allow for the body member to ever lose contact with the coupler."

---

[78] '990 Patent, col. 5 ll. 60–62.

Moreover, because PPC successfully convinced the Arizona Court to adopt this reasoning, PPC is judicially estopped from taking a contrary position in the present litigation.   Judicial estoppel provides that when a party successfully advances a position in one legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.   While not necessarily exhaustive of the appropriate judicial inquiry, courts typically consider whether: (1) the party's current position is "clearly inconsistent" with its earlier successful position; (2) this Court's acceptance of an inconsistent position would create the perception that the party misled either this Court or the previous court; and (3) the party would derive an unfair advantage if not estopped.[79]   In this case, the construction this Court adopted above is derived from reasoning that was advanced by PPC in the Arizona case and adopted by the Arizona Court.   Thus, PPC would have to backtrack on its previous position to now disagree with that construction.   This is the type of situation judicial estoppel was designed to prevent.

Ultimately, PVM is correct that there is disagreement over the meaning of the words of the agreed construction.   The Court also agrees that the Arizona Court's order is correct in its analysis and PPC is judicially estopped from arguing otherwise.   However, rather than adopting large sections of the Arizona Court's order, the Court will alter the construction to better reflect the Arizona Court's reasoning.   Thus, the Court will construe the term phrase as follows: "[A coupler having a first end] rotatably secured over the second end of the tubular post and secured directly to the body (as opposed to secured directly to the post only) in a manner that allows the coupler to rotate and that does not allow for the body member to ever lose contact with the coupler."

---

[79] *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

**II.** **"a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler"**

The claims at issue state that the coaxial cable connector has "a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[80]   The parties largely agree on a construction.  PPC's proposed construction is "a body member secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[81]   PVM's proposed construction is that "the body member is 'secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler' as construed and explained by the court in *Corning Gilbert Inc. v. John Mezzalingua Assocs. Inc.* . . . ."[82]   As with the term phrase in Section I, the key difference between these constructions is that PVM's construction includes "as construed and explained by the Court in *Corning Gilbert Inc. v. John Mezzalingua Assocs. Inc.* . . . ."

PVM argues that this additional language is necessary because, despite agreeing on the ultimate construction adopted by the Arizona Court, PPC is implicitly rejecting the Arizona Court's reasoning by bringing infringement claims.[83]   Chiefly, PVM maintains that PPC rejects the Arizona Court's statement that the body member must extend at least as far as the end of the

---

[80] Joint Claim Chart (Doc. 31) at 2.

[81] *Id.*

[82] *Id.*  In the Arizona litigation, the District Court construed "a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler" to mean the body member is "secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."  Def.'s Counterclaim ¶ 32; Pl.'s Answer to Counterclaim ¶ 32.

[83] Def.'s Claim Construction Br. (Doc. 32) at 17–20.

post that receives the cable.[84]   According to PVM, PPC is implicitly rejecting this statement because PVM's connector allegedly has a body that does not extend as far as the end of the post that receives the cable yet PPC still says PVM is infringing.   Thus, "there must be some unusual interpretation of those words that needs to be resolved by [the Court]."[85]

PPC argues that it is not misinterpreting the Arizona Court.   PPC just thinks PVM's design has a body member that extends past the first end of the tubular post.[86]   From PPC's perspective, the dispute on this term comes down entirely to the infringement question of whether PVM's design has a body that extends past the first end of the tubular post.[87]   So there is no real dispute over the meaning of the claim language for the Court to resolve.   The Court agrees.   Rather than fighting over the proper construction of the claim, PVM and PPC appear to be fighting over whether the body of PVM's connector extends past the first end of the tubular post.

This disagreement appears to stem from the parties' fundamentally different conceptions of PVM's connector.   According to PPC, PVM's connector has a two-part body.[88]   That is, while one part of PVM's body may not extend as far as the first end of the tubular post, there is a second part of the body that does.   PVM argues that the portion of the connector that PPC says is the second part of the body is not actually part of the body.   According to PVM, that part of the connector is called the "back shell."[89]

This dispute is a fact question that should be answered by a jury, rather than a legal question for the Court to answer at the claim construction stage.   However, the Court recognizes that the

---

[84] *Id.*

[85] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 33.

[86] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 2–8.

[87] *Id.*

[88] *Id.*

[89] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 33.

parties may have good arguments that some further construction is necessary to clarify what constitutes a body member as that term is used in the claims of the Patents or whether the Patents contemplate a two-part body.  Such arguments were not presented by the parties in their briefing, nor were they considered in the Arizona litigation.  Thus, if the parties wish for the Court to further construe this term phrase, they may ask to submit supplemental briefing on this point within fourteen (14) days of the date of this Order.

Ultimately, the parties largely agree on a construction.  The only place they depart is on PVM's addition of "as construed and explained by the court in *Corning Gilbert Inc. v. John Mezzalingua Assocs. Inc.* . . . ."  But the Court does not see a need to make that addition.  There is nothing in the Arizona Court's reasoning that clarifies or adds meaning to the construction.  And there is nothing in the Arizona Court's reasoning that sheds any light on the dispute at the center of this term phrase—the one-part versus two-part body issue.  So the Court will adopt the Arizona Court's construction without PVM's addition.  That construction is "a body member secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[90]

### III.   "the coupler including a central bore extending therethrough"

The parties disagree on the meaning of the phrase, "the coupler including a central bore extending therethrough."[91]  Recall that the coupler (also known as the coupling nut) is the end piece of the connector that threads onto the port of the appliance.  PVM's position is that the proper construction of the phrase is "the coupler has an inner diameter that extends from its first end to

---

[90] Ex. G to Def.'s Claim Construction Br. (Doc. 32-7) at 14–15.

[91] Joint Claim Chart (Doc. 31) at 2–3.

its opposing second end."[92]  PPC's position is that the proper construction is "the coupler including a central hole extending therethrough."[93]

There are two key differences between the parties' proposed constructions.  First, PVM contends that a "central bore" is "an inner diameter," while PPC contends that a "central bore" is a "central hole."  PPC argues that by construing "central bore" as "an inner diameter," PVM is suggesting that the central bore must have a smooth and uniform diameter throughout.[94]  However, PVM stated at the *Markman* hearing that this was not its position.[95]  Instead, PVM primarily takes issue with PPC's use of the word "hole" in its construction.  PVM says that "hole" does not appear anywhere in the specification while "inner diameter" does.[96]  The second difference between the parties' constructions is that PVM contends that "extending therethrough" should be further construed as "extends from its first end to its opposing second end," while PPC would keep it as "extending therethrough."

With respect to the disagreement over whether a "central bore" should be construed as a "central hole" or "an inner diameter," the Court adopts PPC's construction of a "central hole."  The Court agrees that the central bore of the coupler does not need to have a consistent inner diameter.  And even though PVM stated that it was not arguing that the coupler had to have a consistent inner diameter, the term "inner diameter" could certainly lead a juror to think that.  Thus, the Court finds that the meaning of "central bore" is better captured by "central hole" than "inner diameter."  While "hole" does not appear anywhere in the Patents, there is no requirement that a

---

[92] *Id.*

[93] *Id.*

[94] Pl.'s Claim Construction Br. (Doc. 33) at 13.

[95] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 41.

[96] *Id.* at 42; *see also* '990 Patent, col. 7 ll. 7–8.

construction only draw words from the Patents.  And the word "hole" carries a clear meaning that should not be confusing to a jury.

With respect to the debate over whether "extending therethrough" should be further construed to mean "extends from its first end to its opposing second end," the Court takes a slightly different tack.  The Court agrees that some further construction is necessary, but it does not agree that PVM's proposal is the best construction.  Both constructions support the same meaning of the term phrase—that the hole extends all the way through the coupler.  This meaning is clear from the ordinary meaning of the claim language and the specification, which consistently depicts a coupler with a hole extending all the way through it.  But this meaning is more clearly captured by the construction "the coupler has a central hole extending through the entire coupler."  Putting it all together, the Court construes "the coupler including a central bore extending therethrough" as "the coupler has a central hole extending through the entire coupler."

## IV.   "a resilient electrically-conductive grounding member"

The term at issue is "a resilient electrically-conductive grounding member."[97]  Recall that the grounding member is the object that maintains contact with the tubular post and the coupling nut such that an electrical ground path can flow.  The dispute here revolves around the meaning of "resilient."  PPC construes "resilient" as "having a spring action," while PVM construes "resilient" as "return[ing] to its original shape after being bent, stretched, pressed or otherwise altered."[98]

PVM argues that "resilient" and "spring action" are distinct concepts in the patent— "resilient" describes a quality of the grounding member, while "spring action" describes how that grounding member functions.[99]  PVM also points out that, in the specification, the first alternate

---

[97] Joint Claim Chart (Doc. 31) at 3.

[98] Id.

[99] Def.'s Claim Construction Br. (Doc. 32) at 25.

grounding member is not described as "resilient," but it is described as having fingers with "spring action"; so PVM argues that it is possible to have a grounding member that has spring action but is not resilient.[100]  Moreover, PVM notes that the phrase "resilient spring fingers" is used elsewhere in the claims of the Patents.[101]  From this, PVM argues that defining "resilient" as "spring action" would render "resilient" superfluous because that phrase would then mean "spring action spring fingers."  Finally, PVM argues that if the Court defined "resilient" to mean "spring action," then the term would be indefinite because it is unclear how much "spring action" is required.[102]  PVM then turns to dictionaries and other cases to support its proposed construction that "resilient" means "return[ing] to its original shape after being bent, stretched, pressed or otherwise altered."[103]

PPC argues that PVM's construction is wrong because it would require the grounding member to return to its exact original shape regardless of how much force was used on it.[104]  But, PPC argues, the specification teaches that the grounding member is initially formed by bending a springy material into a desired shape—so there must be some level of force at which the grounding member succumbs to change.[105]  Moreover, PPC argues that this requirement is divorced from the context of how the grounding member is used in the Patents.[106]  The grounding member functions to maintain electrical contact between the tubular post and the coupler without restricting rotation of the coupler.  What is important then, according to PPC, is that the grounding member have sufficient spring action to hold contact with the coupler, but not so much strength that it doesn't

---

[100] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 9–11.

[101] *See* '990 Patent, col. 11 ll. 50–53.

[102] Def.'s Claim Construction Br. (Doc. 32) at 26.

[103] *Id.* at 26–27.

[104] Pl.'s Claim Construction Br. (Doc. 33) at 18.

[105] *Id.*

[106] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 10–11.

allow the coupler to rotate.  What is not important, according to PPC, is that the grounding member return to its exact original shape.

PVM is correct that PPC's construction of "resilient" as "spring action" is not appropriate. PVM's strongest point is that the term "resilient spring finger" is used throughout the Patents.  If "resilient" simply meant "spring action" then "resilient" would be superfluous, because that term phrase would be "spring action spring finger."  On the other hand, PPC is correct that PVM's construction would improperly require the grounding member to return to its exact original shape regardless of how much force was used on it.  This is an overly strict reading of the word "resilient."  Objects do not need to return to their 100% exact original position to be described as resilient.  For example, consider a sponge.  If that sponge was squeezed, would it not be "resilient" if, after measuring it, it only returned to *nearly* its original shape rather than its *exact* original shape?

Ultimately, the Court finds that PPC's construction of "resilient" as "spring action" is not accurate.  But rather than a need to return to its exact original shape as PVM suggests, "resilient" allows for an object to return to *nearly* its original shape.  In the context of this invention, the use of the term "nearly" is not indefinite.  The Patents cabin the scope of "nearly" by requiring that the grounding member maintain contact with the coupler while still allowing the coupler to rotate.[107]  Thus, the grounding member does not need to return to its 100% exact shape as long as it returns close enough to its original shape such that it can maintain contact with the coupler

---

[107] Terms of degree are definite so long as the claims "provide[] enough certainty to one of skill in the art when read in the context of the invention."  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  And "[f]unctional language can 'promote[] definiteness because it helps bound the scope of the claims by specifying the operations that the [claimed invention] must undertake.'"  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018) (alterations in original) (quoting *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016)).

without restricting the rotation of the coupler.  The Court will thus construe this term as follows: "an electrically-conductive grounding member that returns to its original shape (or nearly its original shape) after being bent, stretched, pressed, or otherwise altered, such that it is able to maintain contact with the tubular post and the coupler without restricting rotation of the coupler."[108]

## V.      "arcuately shaped"; "generally arcuate shaped"

At certain points, the Patents call for an "arcuately shaped" or a "generally arcuate shaped" grounding member.[109]  PVM argues that this term phrase is indefinite or, in the alternative, that "arcuately shaped" should be defined as "shaped like an arc or bow."[110]  PPC argues that both terms mean "curved."[111]

PVM says that the specification describes an arcuately shaped grounding member as one that "extends over or has an arc" and is bent into "an arc."[112]  It further describes an arcuately shaped grounding member as being "generally circular" and as being "out-of-round, and more preferably, oblong, rather than circular."[113]  PVM notes that, while the specification is consistent with the ordinary definition of "arcuately shaped" as "shaped like an arc or a bow," the specification goes further and says that it encompasses being "generally circular."[114]  And as discussed in Section XII, PVM argues the term phrase "generally circular" is indefinite.  So if

---

[108] The "without restricting rotation of the coupler" portion of this construction was not directly at issue in this term phrase.  However, to the extent it is necessary, that portion should be construed consistent with the Court's construction of that term phrase below in Section IX.

[109] Joint Claim Chart (Doc. 31) at 3.

[110] Id.

[111] Id.

[112] Def.'s Claim Construction Br. (Doc. 32) at 27–28.

[113] Id. at 28.

[114] Id.

"arcuately shaped" or "generally arcuate shaped" means "generally circular," then "arcuately shaped" and "generally arcuate shaped" are indefinite by association with the assertedly-indefinite term "generally circular."[115]

Further, PVM argues that the Court should reject PPC's argument that the construction should be "curved."[116]  The Patents use the phrase "arcuate curvature" in the specification and in the claims.[117]  Thus, if arcuate was construed as curved, then the phrase would be "curved curvature."[118]  PVM also argues that PPC's defining both "arcuately shaped" and "generally arcuate shaped" the same way ignores the word "generally."[119]  And lastly, PVM says that PPC's construction as "curved" significantly broadens the meaning of arcuate beyond its ordinary meaning and the Patents did not clearly express an intent to define it so broadly.[120]

PPC says that the specification teaches that the grounding member need not be a geometrically perfect arc, which is why the terms "*generally* arcuate" and "arcuate*ly*" were used.[121]  But PPC argues that the use of a term of degree does not make the terms indefinite because the specification and claim limitations provide a number of guideposts that would allow a person of ordinary skill in the art to discern the scope of the shape of the grounding member.[122]  For example, PPC cites to claim 6 of the '990 Patent, which requires that the grounding member be disposed within an annular recess inside of the coupler, and that the grounding member fit around the tubular

---

[115] *Id.* at 27–29.

[116] *Id.* at 32.

[117] *See, e.g.*, '990 Patent, col. 6 ll. 28–29; '990 Patent, col. 13 ll. 10–12.

[118] Def.'s Claim Construction Br. (Doc. 32) at 32.

[119] *Id.* at 32–33.

[120] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 13.

[121] Pl.'s Claim Construction Br. (Doc. 33) at 19.

[122] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 16–19.

post such that it makes an electrically-conductive path between the coupler and the tubular post.[123]

And the specification depicts the annular recess, the coupler, and the tubular post as round.[124]

Further, it clarifies that the grounding member must maintain contact between these objects

without preventing the rotation of the coupler.[125]  Essentially, PPC's point is that the curvature of

the grounding member has to be such that it can surround a round object (the tubular post) and fit

within a round object (the annular recess of the coupler) while maintaining contact between the

tubular post and the coupler without restricting the rotation of the coupler.[126]  Any object that

would not perform these functions would not be covered by the term "arcuately shaped."  And so,

according to PPC, the Patents provide a clear delineation of the scope of the term.

PVM's argument that the terms "generally arcuate shaped" and "arcuately shaped" are

indefinite is not persuasive.  To begin, PVM's argument that "generally arcuate shaped" and

"arcuately shaped" have different meanings and thus cannot receive the same construction is

wrong.  "Arcuately" and "generally arcuate" are synonymous.  While they both express terms of

degree, the specification provides numerous guideposts that clarify the scope of the term such that

they are not indefinite.[127]  Indeed, the arcuate grounding member is described as "generally

circular," a "generally circular broken ring, or C-shaped member," "out-of-round, and more

preferably oblong, rather than circular," and "extend[ing] . . . over an arc of at least 225"

degrees."[128]  Moreover, the specification emphasizes what "generally arcuate" or "arcuately

---

[123] Id. at 16.

[124] '990 Patent, fig. 2, fig. 3C.

[125] '990 Patent, col. 3 ll. 14–20.

[126] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 16–19.

[127] See Enviro Tech Chem. Servs., Inc. v. Safe Foods Corp., No. 4:21-cv-00601-LPR WL 17721179, at *25 (E.D. Ark. Dec. 15, 2022) (explaining that "[t]he specification need only provide guideposts that allow a skilled artisan to draw meaningfully precise objective boundaries with reasonable certainty") (quotations and citations omitted).

[128] '990 Patent, col. 3 ll. 21–30.

shaped" do not mean.  The specification says that "the grounding member can [also] have a shape *other than* generally circular, such as square, hexagonal, octagonal, oval, etc."[129]  Because arcuately shaped is described as being generally circular, and generally circular is other than square, hexagonal, octagonal, and oval, arcuately shaped must also be other than square, hexagonal, octagonal, and oval.  From these guideposts, it is clear that the terms "generally arcuate shaped" or "arcuately shaped" describe an item that is at least a portion of a circular shape which can be out-of-round or oblong (rather than perfectly circular), but is not an oval, square, hexagon, or octagon.

To the extent that there is still ambiguity regarding the meaning of "generally arcuate" or "arcuately shaped," the specification provides a clear scope of the terms.  The grounding member must be shaped such that it can surround a round object (the tubular post) and fit within a round object (the annular recess of the coupler) while maintaining contact between the tubular post and the coupler and allowing the rotation of the coupler.  This significantly narrows the number of possible shapes that the grounding member can take, as small variations could impact the ability of the invention to function.  That is, small variations could impact the ability of the grounding member to maintain contact with the tubular post and the coupler while still allowing the coupler to rotate.  Thus, the Court finds that there are sufficient guideposts in the specification for discerning the meaning of the terms such that they have a clear scope and are not indefinite.[130]

Still, PVM is correct that the construction of "curved" is inadequate.  As PVM points out, if arcuate simply meant "curved," then the word arcuate would be superfluous in other areas of the Patents—which use the phrase "arcuate curvature."  Further, the word "curved" does not fully

---

[129] '990 Patent, col. 10 ll. 47–49.

[130] *See supra* note 127.

capture the meaning that the patent delineates for "generally arcuate" or "arcuately shaped."  But, PVM's back-up construction of "shaped like an arc or bow" is equally unsatisfying.   The specification never uses the term "bow" and does not encompass the full scope of the grounding member, which is generally at least 225 degrees around.  While all bows are curved, not all curves are bows.

The Court will construe the terms "arcuately shaped" and "generally arcuate shaped" as follows: At least a portion of a circular shape which can be out-of-round or oblong (rather than perfectly circular), but is not square, hexagonal, octagonal, or oval.

## VI.    "the annular recess"

PVM argues that term phrase "the annular recess" is indefinite in claim 8 of the '035 Patent and claims 16 and 25 of the '612 Patent.[131]  PPC argues that the term phrase is definite in each claim but should be construed as "an annular recess" in claim 8 of the '035 Patent.

With respect to claim 8 of the '035 Patent, the language states that "the annular recess and said grounding member surround the enlarged shoulder of the tubular post . . . ."[132]  PVM appears to be arguing that there is an antecedent basis problem with "the annular recess."   An antecedent basis problem arises where, for example, "a claim refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference."[133]  PVM says that it is unclear where "the annular recess" is located because neither the dependent claim (Claim 8) nor the independent claim

---

[131] Joint Claim Chart (Doc. 31) at 3–4.  PPC and PVM agree that no construction is necessary for the term phrase "an annular recess" in claims 16, 17, and 23 of the '612 Patent; claim 7 of the '035 Patent; and claim 6 of the '990 Patent. Joint Claim Chart (Doc. 31) at 3.

[132] '035 Patent, col. 12 ll. 33–35.

[133] Manual of Patent Examining Procedure (MPEP) § 2173.05(e).

(Claim 1) specifies which part of the connector the annular recess is located in.[134]  Thus, according to PVM, the claim could be referring to either the annular recess in the nut, or an annular recess that PVM argues is in the body.[135]

PPC argues that, based on the specification, a person of ordinary skill in the art would not be confused by this omission.  PPC says that the only thing that ever "surround[s] the enlarged shoulder of the tubular post" in the specification is the nut.[136]  Moreover, PPC says that the only time the term "annular recess" is used is when describing an annular recess in the nut.[137]  And the "annular recess" that PVM claims is in the body is not actually labeled as such.[138]  PPC does acknowledge that, because there is no previous mention of an annular recess in the independent claim, the term in the dependent claim should be changed from "the annular recess" to "an annular recess."[139]

PPC is correct on all fronts.  The nut is the only part of the connector that surrounds the enlarged shoulder of the tubular post in the specification.  Further, the preferred embodiments only mention an annular recess when describing an annular recess located in the nut.[140]  And the portion of the body that PVM claims is an annular recess is not actually labeled as such anywhere in the specification.  So a person of ordinary skill in the art would understand that, when the claim describes "the annular recess," it is referring to an annular recess of the nut.[141]  Thus, this term

---

[134] Def.'s Claim Construction Br. (Doc. 32) at 34–35.

[135] *Id.*

[136] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 21.

[137] *Id.*

[138] *Id.* at 21 n.4.

[139] *Id.* at 20.

[140] *See* '035 Patent, col. 3 ll. 33–36; col. 6 ll. 14–16, 59–62; col. 7 ll. 42–44.

[141] *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1319 (Fed. Cir. 2005) (noting that antecedent basis can be present by implication).

isn't indefinite.  As to the proposed construction offered by PPC, the Court agrees that the term should be "an annular recess" instead of "the annular recess."

With respect to claims 16 and 25 of the '612 Patent, PVM argues that, if the preamble in claim 9 is non-limiting (as PPC argues *infra* at sections XXII and XXIII), then there is an antecedent basis problem.[142]  The preamble in claim 9 sets forth "[a] grounding member for a coaxial cable connector having a post and *a nut* . . . ."[143]  Claim 16 depends on claim 15 (which in turn depends on claim 9) which discusses an "annular recess in *the nut*," and claim 25 (which depends on claim 16, which depends on claim 15, which ultimately depends on claim 9) discusses "the annular recess of *the nut*."[144]  According to PVM, if claim 9 is non-limiting, then claim 9 does not require "a nut" and so there is no antecedent basis for "the nut" in claims 16 and 25.[145] Essentially, PVM is arguing that a person of ordinary skill in the art would simply ignore the preamble (if it was non-limiting) and so there would not be antecedent basis for "the nut" in claims 16 and 25.  And it is not possible to have an annular recess unless there is a nut.  PPC disagrees; it argues that a claim can be non-limiting and still serve as antecedent basis.[146]

But the Court need not resolve that dispute if it finds that the preamble in claim 9 is limiting. Indeed, PVM agrees that, if the preamble in claim 9 is limiting, then there is no antecedent basis issue.[147]  So the Court will start there.  A preamble is limiting "if it recites essential structure or

---

[142] Def.'s Claim Construction Br. (Doc. 32) at 33–34; Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 14–15.

[143] '612 Patent, col. 12 ll. 54–55.

[144] '612 Patent, col. 13 ll. 13–14; '612 Patent, *Ex Parte Reexamination*, col. 2 ll 14–15.

[145] Def.'s Claim Construction Br. (Doc. 32) at 33–34, Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 14–15.

[146] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 21–22.

[147] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 70.

steps, or if it is necessary to give life, meaning and vitality to the claim."[148]  "[I]f the body of the claim sets out the complete invention, then the language of the preamble may be superfluous."[149] However, if "limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."[150]

The preamble here is limiting.  The preamble of claim 9 sets out a "grounding member for a coaxial cable connector having a post and a nut . . . ."[151]  Two things are clear from this language. First, this invention involves a grounding member.  And second, this invention involves a grounding member "for a coaxial cable connector."  This second takeaway is important.  While the body of the claim describes a structurally complete invention for a grounding member, the body makes no mention of the coaxial cable connector.  And it is clear from the rest of the specification that the patented invention is not just a grounding member in space, but it is a grounding member "for a coaxial cable connector."[152]  So, the fact that the preamble recites that the grounding member is "for a coaxial cable connector" is an essential structure of the claim that is not set out in the body of the claim.

Moreover, the preamble serves as antecedent basis for terms appearing in the body of the claim.  The preamble mentions that the coaxial cable connector has "*a* post and *a* nut."[153]  Then, the body of the claim discusses "*the* nut" and "*the* post" in several different dependent claims.[154]

---

[148] *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) (internal quotations omitted) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).

[149] *Id.* (internal quotations omitted).

[150] *Id*.

[151] '612 Patent, col. 12 ll. 54–55.

[152] *See, e.g.*, '612 Patent, col. 3 ll. 7–9 ("[T]he present invention relates to a coaxial cable connector . . . .").

[153] '612 Patent, col. 12 ll. 54–55.

[154] *See, e.g.*, '612 Patent, col. 13 ll. 13–15, 17, 20–21.

The Federal Circuit has "repeatedly held a preamble [is] limiting when it serves as antecedent basis for a term appearing in the body of a claim."[155]

Because the preamble recites essential structure, is necessary to give life, meaning and vitality to the claim, and serves as antecedent basis for terms appearing in the body of the claim, the Court concludes that the preamble in claim 9 is limiting. Thus, PVM's indefiniteness challenge fails and no further construction is necessary.

## VII.   "proximate to the first end of the coupler"

The claims at issue require that the central bore of the coupler have an annular recess "proximate to the first end of the coupler."[156]  Recall that the coupler has a first end that is rotatably secured directly to the body and an opposing second end that engages with the port of the appliance.  And the coupler has a central hole extending through the coupler.  Within that hole there is an annular recess where the grounding member is retained in the preferred embodiment. The location of that annular recess is described by the claims as being "proximate to the first end of the coupler."[157]  The parties have submitted competing constructions of what "proximate" means.

PVM's argument is that "proximate" describes when something is directly next to something else in an absolute sense.[158]  PVM's support for this construction comes from dictionary

---

[155] *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1375 (Fed. Cir. 2021) (quoting *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019)).

[156] Joint Claim Chart (Doc. 31) at 4.

[157] *Id*.

[158] Def.'s Claim Construction Br. (Doc. 32) at 36–37.

definitions stating that "proximate" means "next to" or "nearest in space."[159]   Thus, PVM's proposed construction is that "the annular recess is next to the first end of the coupler."[160]

PPC's proposed construction is that the annular recess is "closer to the first end of the coupler than the second end of the coupler."[161]   PPC says that, in the specification, "proximate" is a term that is used to describe relative positioning.[162]   Further, PPC notes that the specification also describes the coupler as having an inwardly directed flange proximate to the first end of the coupler.[163]   And a depiction of the preferred embodiment shows that the flange is closer to the first end than the annular recess is.[164]   So, according to PPC, "proximate" cannot mean "next to" in an absolute sense because both the flange and the annular recess can't be directly next to the first end of the coupler.

PVM's counterargument is that the claim involving the flange is in a different claim than the claim at issue here, and the claims don't depend on each other.[165]   While this is true, other patent claims are valuable guideposts during claim construction.   The Federal Circuit explained that the same term appearing in different claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meaning.[166]

Overall, PPC has the better of the argument.   Reading "proximate" as "next to" would not make sense given the rest of the specification.   The specification describes the flange as

---

[159] *Id.*

[160] Joint Claim Chart (Doc. 31) at 4.

[161] *Id.*

[162] Pl.'s Claim Construction Br. (Doc. 33) at 24.

[163] *Id.* at 24–25.

[164] *Id.*

[165] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 16–17.

[166] *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001).

"proximate" to the first end, and the preferred embodiment clearly depicts the flange as closer to the first end than the annular recess is.[167]  PPC is thus persuasive when it argues that the term proximate is being used in a general sense, rather than referring to an absolute or specific location. And the use of a relative definition is necessary to delineate the scope of the term.  Moreover, PVM's arguments to the contrary rely entirely on extrinsic evidence, which is second-best evidence compared to the specification.  Thus, the Court will adopt PPC's construction that the annular recess is "closer to the first end of the coupler than the second end of the coupler."

**VIII.  "said grounding member surround the enlarged shoulder of the tubular post"; "wherein at least a portion of the grounding member contacting the tubular post surrounds the enlarged shoulder of the tubular post"**

The parties' dispute here centers on the use of the word "surround" in three different claims. The first two claims say that "said grounding member surround the enlarged shoulder of the tubular post," and the third claim says, "wherein at least a portion of the grounding member contacting the tubular post surrounds the enlarged shoulder of the tubular post."[168]  With slight variations accounting for grammar, PPC wants to substitute "positioned around" for "surround" in all three claims,[169] and PVM wants to substitute "form an enclosure around" for "surround" in all three claims.[170]

PVM's argument is that the ordinary meaning of "surround" is to form an enclosure.  To reach this conclusion, PVM relies on dictionary definitions and an analogy to a moat.[171]  It says

---

[167] '990 Patent, col. 11 ll. 40–43, fig. 3C.

[168] '990 Patent, col. 11 ll. 23–25; '035 Patent, col. 12 ll. 33–35; '126 Patent, col. 12 ll. 19–21.

[169] Joint Claim Chart (Doc. 31) at 4.

[170] *Id.*  In addition to the grounding member surrounding the tubular post, PVM wants to add to that the annular recess also surrounds the tubular post.  But with respect to the first two claims, the claims already state that before the quoted portion that the parties disagree over.  With respect to the third claim, PVM does not supply any argument for why that addition should be made, and the Court cannot come up with one either.

[171] Def.'s Claim Construction Br. (Doc. 32) at 38–39.  For example, PVM cites *The Concise Oxford Dictionary of Current English, Eighth Edition*, for its definition of "surrounds" as to "come or be all round; encircle, enclose."

that a person would understand the sentence "the moat surrounds the castle" to mean that the moat encircles the entirety of the castle.[172]  PVM also points to the specification, which teaches that "the grounding member *surrounds* the enlarged shoulder of the tubular post. . . ." and "*[a]t least portions* of the grounding member contact the outer surface of such enlarged shoulder."[173]  PVM's argument is that "surrounds" does not merely mean surrounding "a portion" of the tubular post because the inventors used "at least portions of" to express that meaning.  Thus, "surrounds" must mean something more than just being "positioned around" as PPC suggests.[174]

Finally, PVM points out that the specification uses the word "surround" elsewhere in the Patents in a way that is consistent with its definition.[175]  The specification explains that the center conductor of the coaxial cable is surrounded by dielectric material, that the dielectric material is surrounded by an outer conductor, and that the outer conductor is surrounded by a cable jacket.  In these examples, "surround" is used to describe an object that completely encircles the object beneath it.

PPC argues that "surrounds" just means "positioned around."[176]  PPC bases its argument on the specification, which repeatedly describes the grounding member as a "C-shaped member" or as being "at least 225º around."[177]  Thus, PPC argues that the specification contemplates a grounding member that does not form a full 360º enclosure around the tubular post, and so

---

[172] Def.'s Claim Construction Br. (Doc. 32) at 38.

[173] *Id.* at 39.

[174] *Id.*

[175] Def.'s Construction Br. (Doc. 41) at 18–19.

[176] Joint Claim Chart (Doc. 31) at 4.

[177] Pl.'s Claim Construction Br. (Doc. 33) at 26–29.

construing "surrounds" as to "form an enclosure around" would read out several of the preferred embodiments.[178]

PVM's use of extrinsic evidence—dictionary definitions and an analogy to a moat—does not move the needle in light of the competing intrinsic evidence.  The specification specifically describes and depicts a number of embodiments in which the grounding member is less than a complete circle.[179]  Reading "surrounds" to mean "fully encircling" would read these embodiments out of the patent.  And with respect to the use of "surrounds" in the context of the coaxial cable itself, the use of surrounds there is consistent with PPC's definition as well.  An object that completely encircles another object is still accurately described as being "positioned around" that other object.  Thus, construing "surrounds" to mean "positioned around" is most consistent with the intrinsic evidence.  So the Court will adopt PPC's constructions.

As it appears in claim 6 of the '990 Patent and claim 8 of the '035 Patent, the Court will construe the term phrase as "said grounding member positioned around the enlarged shoulder of the tubular post."  And in claim 1 of the '126 Patent, the term phrase will be construed as "wherein at least a portion of the grounding member contacting the tubular post is positioned around the enlarged shoulder of the tubular post."[180]

## IX.    "without restricting rotation of the coupler relative to the tubular post"

The claims at issue state that the "electrically conductive grounding member provides the electrically-conductive path between the coupler and the tubular post without restricting rotation

---

[178] *Id.*

[179] *See, e.g.*, '990 Patent, col. 3 ll. 21–29.

[180] For what it's worth, the moat analogy isn't as good as it might seem.  If a moat went around a castle but its two ends were blocked from meeting by a very thin strip of land, wouldn't we still say the moat surrounds the castle?  Similarly, we define lakes as bodies of water that are "surrounded" by land.  *See* National Geographic, *Lake* https://education.nationalgeographic.org/resource/lake/.  But we know that "surrounded" in this context cannot mean completely surrounded because lakes are generally fed by and then flow into streams and rivers.  *See id.*

of the coupler relative to the tubular post."[181]  The parties dispute what "without restricting rotation of the coupler relative to the tubular post" means.  PPC argues that it should be construed as "without preventing rotation of the coupler relative to the tubular post."[182]  PVM argues that it should be construed as "the coupler rotates relative to the tubular post without any limitation placed on it by the grounding member."[183]

PVM argues "without restricting rotation" means that no restriction whatsoever can be placed on the rotation of the coupler.[184]  PVM says the ordinary meaning of "restricting" is to confine, bound or limit, which is less severe than PPC's construction that "restricting" means to prevent.[185]  And because the language is "*without* restricting rotation," then the rotation of the coupler cannot be confined, bounded, or limited in any way.[186]  Additionally, PVM points out that PPC argued in the Arizona case that "without restricting rotation" meant that the coupler had to "spin like a top" "without interference" and be "freely rotatable and then some."[187]

PPC argues that "without restricting rotation" means "without preventing rotation."[188]  PPC points to the specification, which states that "the present invention provides a coaxial cable connector that ensures a reliable grounding path without creating undue interference with free rotation of the coupler . . . ."[189]  PPC's point is that, by saying "without creating *undue* interference," the specification acknowledges that some level of interference is going to occur—it

---

[181] Joint Claim Chart (Doc. 31) at 4; '990 Patent, *Ex Parte Reexamination*, col. 2 ll. 1–10.

[182] Joint Claim Chart (Doc. 31) at 4.

[183] *Id.*

[184] Def.'s Claim Construction Br. (Doc. 32) at 39–42.

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] Pl.'s Claim Construction Br. (Doc. 33) at 29–30.

[189] *Id.*; '990 Patent, col. 10 ll. 26–29.

just can't be undue.[190]  Thus, PPC's argument is that the patent allows for some limitations on rotation so long as the rotation is not completely stopped.[191]  PPC also argues that PVM's construction would read out embodiments from the Patents.[192]  That's because PVM's construction would require a frictionless space where the coupler is able to spin freely without any restriction at all.  But the specification teaches that the grounding member contacts the coupler.[193]  Thus, even if minute, there must be some restriction on rotation caused by that contact.  Finally, PPC says that its arguments in the Arizona case are beside the point.  PPC points out that the arguments in that case were about the restriction on rotation caused by whether the coupler was attached to the body or the post—which is a different issue in a different claim.  And regardless, the Arizona Court explicitly rejected PPC's argument.[194]

PPC is correct that the specification and embodiments contemplate the grounding member having some level of interference with the rotation of the coupler, and thus PVM's construction would read out the embodiments of these Patents.  But PVM is correct that PPC's construction would seemingly cover a grounding member that placed so much restriction on the rotation of the coupler that a user would need tons of force to rotate it.  As long as the coupler was ultimately able to rotate, PPC's construction would cover it.

PVM's concern can be resolved by looking at the purpose of the invention.  The specification teaches that the coupler is threaded onto the port of an appliance by an installer with either the installer's fingers or a wrench.[195]  And the specification further teaches that the

---

[190] *Id.*

[191] *Id.*

[192] *Id.*

[193] *Id.*

[194] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 29.

[195] '990 Patent, col. 1 ll. 60–63.

grounding member cannot unduly interfere with the rotation of the coupler.[196]  So the specification clarifies that the grounding member must not unduly interfere with the rotation of the coupler such that an installer would not be able to rotate the coupler with the installer's fingers or a wrench. The extreme hypothetical proposed by PVM would not actually be covered by the Patents.

The Court needs to clarify the foregoing outer scope through a further construction.  Thus, "without restricting rotation of the coupler relative to the tubular post" will be construed as "without restricting rotation of the coupler relative to the tubular post to such an extent that an installer would be unable to rotate the coupler with the installer's fingers or common installation tools such as a wrench."

## X.    "a ring portion"

The claim at issue describes a grounding member with a "plurality of fingers extending from the ring portion."[197]  PVM argues that the term "ring portion" should be construed as "the radially flat circular portion of the grounding ring, distinct from the plurality of fingers extending from the ring portion."[198]  PPC argues that the term "ring portion" should be construed as "a curved strip."[199]

PVM argues that its construction is consistent with the first and second alternate embodiments, which are the only two embodiments that specifically refer to a grounding member with "a ring portion."[200]  The first alternate embodiment describes a grounding member with "a ring portion and a plurality of fingers that project at approximately a 30º angle from the plane of

---

[196] '990 Patent, col. 10 ll. 26–29.

[197] Joint Claim Chart (Doc. 31) at 4; '990 Patent, col. 14 ll. 10–11.

[198] Joint Claim Chart (Doc. 31) at 4.

[199] *Id.*

[200] Def.'s Claim Construction Br. (Doc. 32) at 43.

the ring."[201]  The second alternate embodiment describes a grounding member with "a ring portion and a plurality of fingers extending radially from the ring portion at about a 45º angle from the plane of the ring portion."[202]  PVM argues that both embodiments depict a radially flat grounding member with a full-circle ring portion that is distinct from the plurality of fingers that extend from it.[203]  Because these are the only two embodiments that describe "a ring portion" specifically, PVM argues that the construction of "ring portion" should be tailored to these two embodiments.[204] Moreover, PVM argues that its construction is consistent with the common and ordinary meaning of "ring."[205]

Before addressing the main bone of contention between the parties, there is a threshold matter to discuss.  It appears that PVM's understanding of the first two embodiments as showing a "radially flat" ring is incorrect.  As PPC argues, if PVM's construction of "a ring portion" is based on the first and second embodiment, then instead of "radially flat," PVM must actually mean "the *axially flat* circular portion of the grounding ring."[206]  "Radially flat" was either a typo on PVM's part or a misunderstanding of the meaning of the term.  This is a little complicated to explain, so please hold onto your hat.

---

[201] *Id.*

[202] *Id.*

[203] *Id.* at 43–44.

[204] *Id.*

[205] *Id.*

[206] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 89 (counsel for PPC stating, "The axis of this connector is the one that goes straight through it along the center conductor.  So that's the axial direction.  Radial are those things that radiate away from that.  And so the embodiment in Figure 7 is an axially flat [grounding member] because it's flat in the axial direction.  It has radial width.").

The first and second embodiments have minimal axial width and much greater radial width, such that the ring is shaped more like a flat washer than a wedding ring.  For ease of understanding this analogy only, the Court provides general pictures of a flat washer and a wedding ring.

 

The grounding member in the first two embodiments (which looks more like a flat washer) is "axially flat," not "radially flat."  There are embodiments in the Patents that are "radially flat," but they are not the first two embodiments.  Those "radially flat" embodiments are shaped more like a wedding ring than a washer.  Such "radially flat" grounding members can be seen in the fourth, fifth, and sixth alternate grounding members.[207]  Based on PVM's argument, it is clear that the "radially flat" grounding members in the fourth, fifth, and sixth alternate embodiments are not the washer-like shape PVM is attempting to argue for the Court to adopt.

---

[207] The numbers associated with the alternate embodiments and the numbers associated with the alternate grounding members do not perfectly align.  That's because the fourth alternate embodiment has two different alternate grounding members (the fourth and fifth alternate grounding members), and the fifth alternate embodiment does not have any grounding members.  This is different from the first, second, third, and sixth alternate embodiments which each have one alternate grounding member.

The following images from the specification clarify the distinction between an "axially flat" washer and a "radially flat" wedding band.



Figure 8A depicts a grounding member standing upright and viewed from its side.  The line going through the center of ring is the axis of the connector.  The grounding member is "axially flat" because it has very little width along the axis of the connector.  If the grounding member were wider in the axial direction, it would start to look like a wedding ring or a tube.  Figure 9C is an example of a grounding member with greater axial width, also viewed upright and from its side.  Figure 8D is the same axially flat grounding member from Figure 8A, only it is viewed head-on instead of from its side.  The grounding member has radial width (i.e., it is not radially flat) because the grounding member is elongated in a direction that radiates away from the axis of the connector.

43

Because it has greater radial width than axial width, it looks more like a flat washer than a wedding ring.  Figure 9D is an example of a grounding member that has minimal radial width.  Figure 9D is the same radially flat grounding member from Figure 9C, only it is viewed head-on instead of from its side.  Because it has less radial width than axial width, it looks more like a wedding ring and is properly considered "radially flat."

Regardless of whether PVM is saying that the construction of "ring portion" is "axially flat" or "radially flat," PVM is trying to rule out the possibility that the disputed term could cover both types of grounding members—by limiting the disputed term's construction to the grounding members depicted in the first and second embodiments.  These two embodiments show grounding members of the same type of ring—axially flat (or as PVM incorrectly states, "radially flat").

 PPC argues that the construction of "ring portion" should not be limited to those two embodiments.  Instead, PPC argues that all of the grounding members depicted across all of the embodiments, regardless of whether they are axially or radially flat, depict "ring portions," even if they are not explicitly called that in the embodiments.[208]  For example, the third alternate embodiment describes a grounding member that "comprises a ring with multiple points of contact, or internal lugs, around the inner perimeter of the ring . . . ."[209]  The fourth alternate embodiment describes a grounding member with a "C-shaped ring."[210]  And the sixth alternate embodiment describes a grounding member with a "circumferential metallic band" that "generally defines a section of a cylindrical surface."[211]  Despite not explicitly using the term "ring portion," PPC

---

[208] Pl.'s Claim Construction Br. (Doc. 33) at 30–32.

[209] '990 Patent, col. 8 ll. 51–53.

[210] '990 Patent, col. 9 l. 14.

[211] '990 Patent, col. 10 ll. 6–7, 15.

argues that these embodiments still describe ring portions.[212]   And several of these alternate embodiments have a different type of flatness than the first and second embodiments.  Instead of the axially flat, washer-like shape of the first and second embodiments, the fourth and sixth alternate embodiments include radially flat, wedding-band shaped grounding members.  Thus, PPC argues that PVM's construction improperly limits the scope of the claim based on a few specific embodiments in the specification and ignores the rest of the specification.[213]

The Court is persuaded that, while the term "ring portion" only appears in the first and second embodiments, the feature being described is present in several other embodiments.  Indeed, two of the other embodiments even use the word "ring" to describe the grounding member.  The third embodiment describes a "ring," and the fourth embodiment describes a "C-shaped ring."  The slight difference in word choice is not significant enough to indicate a difference in meaning.  Nor does this difference show that the patentee expressly disavowed that "ring portion" included the other embodiments, or that the patentee clearly defined "ring portion" as something that excluded the other embodiments.[214]   And importantly, many of these alternate grounding members depict radially flat, wedding-band-type rings rather than the axially flat, washer-like ring of the first and second embodiments.  Thus, PVM's construction reads limitations into the claim language from the specification that are unwarranted.  So the requirement in PVM's construction that the grounding member have one type of flatness is overly narrow and will not be included in the Court's construction.

---

[212] Pl.'s Claim Construction Br. (Doc. 33) at 30–32.

[213] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 31–32.

[214] *Thorner v. Sony Computer Entm't America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (noting that claim language is given its ordinary meaning except "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution").

Although PVM's construction is inaccurate for the reasons just discussed, PPC's construction of a "curved strip" is also inadequate.  Instead, the Court's construction will be consistent with other sections in this Order construing the shape of the grounding member.  For the reasons discussed in Section V, that construction is "the portion of the grounding member that forms at least a portion of a circular shape and can be out-of-round or oblong, but not square, hexagonal, octagonal, or oval."

But this is only part of the final construction because there is more at issue than just the shape of the grounding member.  PVM is correct to point out that the ring portion being described is distinct from the fingers.  The fingers are described as "extending from the ring portion," suggesting that these are different aspects of the grounding member that the Court must distinguish.[215]  Moreover, while PPC does not think such a distinction needs to be explicitly stated in the construction, it acknowledges that the ring portion is distinct from the projections.[216]  And PPC successfully argued that the "ring portion" was "distinct from the contact portion" of the grounding member in the Arizona case.[217]  So the Court will draw this distinction in its construction.

However, the Court will broaden the distinction to be between the "ring portion" and "projections," rather than just between the "ring portion" and "fingers."  That is because the Court does not read "ring portion" as limited to the first two embodiments, so the Court must also distinguish the "ring portion" from the "lugs" that appear elsewhere in the specification.  Taking everything into account, the Court will construe "a ring portion" as "the portion of the grounding member that forms at least part of a circular shape and can be out-of-round or oblong (rather than

---

[215] '990 Patent, col. 14 ll. 10–11.

[216] June 29, 2023 Hr'g Tr. Pt. I (Rough) at 94–95.

[217] Ex. G to Def.'s Claim Construction Br. (Doc. 32-7) at 11–12.

46

perfectly circular), but not square, hexagonal, octagonal, or oval, and is distinct from the plurality of projections."

## XI.    "fingers"

The claim at issue describes a grounding member with a "plurality of fingers extending from the ring portion."[218]  PVM argues that the term "fingers" should be construed as "finger-like projections that extend at an angle from a flat plane of a ring portion."[219]  PPC argues that the term "fingers" should be construed as "projections."[220]

PVM argues that its construction is consistent with the first and second alternate embodiments, which are the only two embodiments that specifically refer to "fingers."[221]  The first alternate embodiment describes a grounding member with "a ring portion and a plurality of fingers that project at approximately a 30º angle from the plane of the ring."[222]  The second alternate embodiment describes a grounding member with "a ring portion and a plurality of fingers extending radially from the ring portion at about a 45º angle from the plane of the ring portion."[223] Because these are the only two embodiments that describe "fingers" specifically, PVM argues that the construction of "fingers" should be tailored to these two embodiments.[224]  Additionally, PVM argues that the ordinary meaning of "fingers" when referring to an object's shape is something "finger-like."[225]

---

[218] Joint Claim Chart (Doc. 31) at 4; '990 Patent, col. 14 ll. 10–11.

[219] Joint Claim Chart (Doc. 31) at 4.

[220] Id.

[221] Def.'s Claim Construction Br. (Doc. 32) at 45; Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 23.

[222] '990 Patent, col. 8 ll. 7–8.

[223] '990 Patent, col. 8 ll. 32–35.

[224] Def.'s Claim Construction Br. (Doc. 32) at 45.

[225] Id.

PPC argues that the construction of "fingers" should not be limited to those two embodiments.  PPC argues that the third alternate embodiment and sixth alternate embodiment also depict fingers even if they are not explicitly called that in the embodiment.[226]  The third alternate embodiment describes "internal lugs."[227]  These lugs are depicted as axially flat, rounded nub-like projections that extend inwardly towards the tubular post on the same plane as the axially flat, washer-like ring portion of the grounding member.  As such, the grounding member has a consistent axial width when it is upright and viewed from its side.[228]  And, according to PPC, the sixth alternate embodiment depicts a grounding member with projections that extend from a non-flat surface of the ring portion.[229]  Thus, PPC argues that the third alternate embodiment does not allow for the construction that fingers only "extend at an angle" and the sixth alternate embodiment does not allow for the construction that fingers only extend "from a flat plane of a ring portion."[230]

The Court finds that there is a distinction between what the specification describes as "lugs" and what the specification describes as "fingers."  That distinction is most clearly highlighted in the first alternate embodiment.  That embodiment has "a plurality of fingers that project at . . . [an] angle from the plane of the ring," and "optional internal lugs that contact the outer diameter of the non-shoulder portion of the tubular post."[231]  In this embodiment, "fingers" are projections that project at an angle away from the radial plane of the ring, while "internal lugs" are internal projections that project on the same plane as the ring.  That is, when the grounding

---

[226] Pl.'s Claim Construction Br. (Doc. 33) at 32–34.

[227] '990 Patent, col. 8 ll. 53–58.

[228] *See generally* the discussion in Section X regarding the distinction between "radially flat" and "axially flat."  In short, this grounding member and its lugs are axially flat because they have minimal axial width and relatively greater radial width.

[229] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 33.

[230] Pl.'s Claim Construction Br. (Doc. 33) at 32–34.

[231] '990 Patent, col. 8 ll. 7–17.

member is upright and viewed from the side, it is possible to see the fingers extending at an angle from the ring, but the lugs are not visible because they are flush with the vertical plane of the ring.

The following illustrations from various embodiments in the specification help to clarify the relevant distinction.  Let's start with the first alternate embodiment.



Figure 6C depicts an axially flat grounding member viewed head-on in an upright position. The fingers are numbered 603 and the internal lugs are numbered 605.  Figure 6B depicts the same grounding member viewed upright and on its side.  The fingers can be seen extending away from the plane of the ring of the grounding member.  However, the lugs cannot be seen because they extend inwardly on the same plane as the ring of the grounding member. Because both fingers and lugs are used in the same embodiment describing distinct physical features, the patentee intended for the terms to have distinct meanings.

The distinction drawn in the first embodiment is consistent with the use of these terms throughout the specification.  For example, consider the second alternate embodiment.



The second alternate embodiment depicts (and uses the term) "fingers" (703) as opposed to lugs. These fingers are projections that extend at an angle relative to the plane of the ring portion (i.e., they extend in a radial direction while their axial position changes).  As such, they are visible projecting away from the ring portion of the grounding member when the grounding member is upright and viewed on its side in Figure 7B.

 

The third alternate embodiment is different.  The third alternate embodiment depicts (and uses the terms) internal lugs (803) and external lugs (804) as opposed to fingers.  Rather than being projections that extend at an angle from the radial plane, the lugs extend from the ring and are on the same plane as the ring (i.e., they extend in a radial direction while maintaining their axial position).  As such, they are not visible when the grounding member is upright and viewed on its side in Figure 8A.

The fourth and sixth alternate embodiments are different from the second alternate embodiment and the third alternate embodiment.







The fourth and sixth alternate embodiments depict (and use the term) "projections" as opposed to the terms fingers or lugs.  Notably, in the sixth alternate embodiment, when the projections (1117) extend at an angle relative to the plane of the ring, PPC argues that these should be considered "fingers."[232]  But in the fourth alternate embodiment, when the projections (918) extend in the same plane as the ring, PPC does not make that argument.[233]

While the Court should be hesitant to limit claim language based on specific embodiments, the specification clearly differentiates between fingers and lugs.[234]  Thus, PPC's attempt to have the Court broaden the scope of "fingers" to encompass embodiments that have "lugs" (specifically

---

[232] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 33.

[233] *Id*.

[234] *Thorner*, 669 F.3d at 1365.

the third alternate embodiment) is impermissible.  There is not a single embodiment where "fingers" do not extend at an angle relative to the plane of the ring portion.  And any time an embodiment has projections that extend on the same plane as the ring portion, the projections are called something other than "fingers."  So the Court will adopt the portion of PVM's construction that says that fingers are "projections that extend at an angle."

However, the Court does not agree that "fingers" should be construed as being "finger-like."  The dictionary definitions PVM submitted in support of this construction describe fingers as being "long [and] narrow."[235]  But the second alternate embodiment depicts fingers that are not long and narrow.  Instead, the fingers in the second alternate embodiment appear to have equal height and width.  Thus, construing "fingers" to mean "finger-like" would likely be misleading to a jury considering the specification.

Additionally, the Court doesn't agree with the portion of PVM's construction that requires the projections to extend "from a flat plane of a ring portion."  First of all, it is unclear exactly what PVM means by the "flat plane of a ring portion."  However, because PVM argues that "fingers" should be limited to the first and second alternate embodiments, it is likely PVM is referring to the axially flat ring portions of these two embodiments.  But such a requirement reads out the sixth alternate embodiment.  The grounding member in the sixth embodiment appears to be radially flat rather than axially flat like the first two embodiments.  Yet the Court finds that the sixth embodiment also has fingers.  Even though the sixth embodiment is described as having "projections" rather than "fingers," the projections in that embodiment extend at an angle relative to the radial plane of the ring like fingers elsewhere in the specification, and they are shaped similar to the fingers in the second alternate embodiment.  So the Court finds that it is possible to have

---

[235] Def.'s Claim Construction Br. (Doc. 32) at 45.

fingers that do not extend away from the "flat plane" of the ring portion as that term is used by PVM.  Combining all of these findings, the Court construes "fingers" as "projections that extend at an angle from the plane of the ring portion of the grounding member."[236]

## XII.    "generally circular"; "a general circular shape"

The Patents also describe the grounding member as "generally circular" and having "a general circular shape."[237]  PVM argues that these terms are indefinite.[238]  PPC argues that the terms should be construed as "round" and having "a round shape."[239]

PVM argues that these term phrases are indefinite because they include terms of degree that do not have objective boundaries.[240]  The specification states that "generally circular" is something "other than . . . square, hexagonal, octagonal, oval, etc."[241]  But PVM argues that this just adds further confusion.  At what point does an object go from being "generally circular" or "round" (as PPC would define it) to "oval"?  Moreover, PVM argues that PPC's construction of "round" and "a round shape" reads out the words "generally" and "general."[242]

PPC says the specification provides several examples of generally round members that are not geometrically perfect circles.[243]  For example, the specification mentions a "C-shaped member," "a shape that is out-of-round," an "oblong, rather than circular" shape, a "generally

---

[236] The term "ring portion" was not directly at issue in this term phrase.  However, to the extent it is necessary, that term should be construed consistent with the Court's construction of that term phrase above in Section X.

[237] Joint Claim Chart (Doc. 31) at 4–5.

[238] *Id.*

[239] *Id.*

[240] Def.'s Claim Construction Br. (Doc. 32) at 45–47.

[241] *Id.*

[242] *Id.* at 46–47.

[243] Pl.'s Claim Construction Br. (Doc. 33) at 34.

arcuately shaped" member, and "a generally circular broken ring."[244]  According to PPC, all of these shapes have one thing in common: they are round.[245]

As with the terms "generally arcuate" and "arcuately shaped" discussed above in Section V, PPC argues that the use of a term of degree does not make the terms indefinite because the specification and claim limitations provide a number of guideposts that would allow a person of ordinary skill in the art to discern the scope of the shape that the grounding member must have.[246] For example, PPC cites to claim 9 of the '035 Patent, which requires that the grounding member is disposed between the tubular post and the coupler, and that the grounding member provides an electrically-conductive path between the coupler and the tubular post while the coupler rotates around the tubular post.[247]  And the specification makes clear that the coupler and the tubular post are round.[248]  Further, it clarifies that the grounding member must maintain contact between these objects without preventing the rotation of the coupler.[249]  Essentially, PPC's point is that the curvature of the grounding member has to be such that it can fit between two round objects (the tubular post and the coupler) and maintain contact between these two round objects while still allowing the coupler to rotate.[250]  Any object that would not perform these functions would not be covered by the term "generally circular."  And so, according to PPC, the Patents provide a clear delineation of the scope of the term.[251]

---

[244] '990 Patent, col. 3 ll. 21–30.

[245] Pl.'s Claim Construction Br. (Doc. 33) at 34.

[246] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 34–37.

[247] '035 Patent, col. 11 ll. 53–67, col. 12 ll. 1–10, 38–39.

[248] '990 Patent, fig. 2; fig. 3C.

[249] '990 Patent, col. 3 ll. 14–20.

[250] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 34–37.

[251] *Id.*

PVM's argument that the term "generally circular" is indefinite is unpersuasive. The specification provides numerous guideposts that elucidate the scope of the term such that "generally" is not indefinite. Throughout the specification, the "generally circular" grounding member is described as, for example, a "C-shaped member," a "broken ring," "a shape that is out-of-round," an "oblong, rather than circular" shape, a "generally arcuately shaped" member, and "approximat[ing] a section of a hollow cylinder."[252] Moreover, the specification describes what "generally circular" does not mean. The specification says that "the grounding member can [also] have a shape *other than* generally circular, such as square, hexagonal, octagonal, oval, etc."[253] From these descriptions, it is clear that "generally circular" is a shape that is at least a portion of a circle which can be slightly out-of-round or oblong rather than perfectly circular, and is not an oval, square, hexagon, or octagon.

To the extent that there is still ambiguity regarding the meaning of "generally circular," the Patents provide a clear scope of the term. The grounding member must be shaped such that it can fit between two round objects (the tubular post and the coupler) and maintain contact between these two round objects while still allowing the coupler to rotate. This significantly narrows the number of possible shapes that the grounding member can take, as small variations could impact the ability for the invention to function. Thus, the Court finds that there are sufficient guideposts in the Patents for discerning the meaning of "generally circular," such that it has a clear scope and is not indefinite.[254] However, the Court will further construe the term as "at least part of a circular shape that can be out-of-round or oblong (rather than perfectly circular), but not square, hexagonal, octagonal, or oval."

---

[252] '990 Patent, col. 3 ll. 21–30, col. 9 ll. 23–24.

[253] '990 Patent, col. 10 ll. 47–49.

[254] *See supra* note 127.

**XIII.** **"a portion of the grounding member . . . is angled relative to the portion of the grounding member that contacts the tubular post"**

This claim describes an angled portion of the grounding member.  PVM argues that the term is indefinite.[255]  PPC argues that this term is definite.  It says that the term should be construed to read "a portion of the grounding member . . . is positioned at an angle relative to the portion of the grounding member that contacts the tubular post."[256]

PVM argues that this phrase is indefinite because it can be interpreted in two materially different ways.[257]  The first way PVM says it can be read is that there is a portion of the grounding member that does not contact the tubular post and that portion is angled (in some undefined way) relative to the portion of the grounding member that does contact the tubular post.[258]  The second way PVM says this phrase can be read is that there is a portion of the grounding member that does not contact the tubular post, and there is also another portion of the grounding member that does not contact the post which is angled (in some undefined way) relative to the portion of the grounding member that contacts the tubular post.[259]

PPC says that PVM's second interpretation is unreasonable.  PPC says that the phrase "a portion of the grounding member" clearly describes one portion of the grounding member.[260]  And that one portion is angled relative to the portion of the grounding member that contacts the tubular post.  Moreover, PPC says the specification, specifically Figure 11A, demonstrates what is meant by the phrase.[261]  That figure depicts a grounding member with two portions: one contacting the

---

[255] Joint Claim Chart (Doc. 31) at 5.

[256] *Id.*

[257] Def.'s Claim Construction Br. (Doc. 32) at 49.

[258] *Id.*

[259] *Id.*

[260] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 38–39.

[261] *Id.* at 39.

post, and another portion that is angled relative to that portion.[262]  And the embodiments for the first and second alternate grounding members state that the angled portion is angled at approximately 30 degrees or 45 degrees.[263]  Thus, according to PPC, the specification clearly depicts what a portion of the grounding member being angled relative to another portion of the grounding member involves.

The Court agrees with PPC that there is little room for confusion based on the text of the claim.  And to the extent there is any ambiguity, the specification clears it up.  Thus, the Court will construe the claim as "a portion of the grounding member . . . is positioned at an angle relative to the portion of the grounding member that contacts the tubular post."

## XIV.   "internal lugs"

The claim at issue describes a grounding member with "internal lugs" around its inner perimeter that contact the tubular post.[264]  PVM argues that the term "internal lugs" should be construed as "flat projections around the inner perimeter of the ring portion of the grounding member that extend in the same plane as the ring portion of the grounding member."[265]  PPC argues that the term "internal lugs" should be construed as "internal raised or projecting areas."[266]

PVM argues that its construction is consistent with the third alternate embodiment, which according to PVM is the only embodiment in the specification where the term "internal lugs" is used.[267]  The third alternate embodiment depicts an axially flat, washer-like ring (802) with axially

---

[262] '990 Patent, fig. 11A.

[263] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 39.

[264] '612 Patent, col. 13 ll. 18–21.

[265] Joint Claim Chart (Doc. 31) at 5.

[266] *Id.*

[267] Def.'s Claim Construction Br. (Doc. 32) at 50.

flat projections around the inside of the ring (803) that project inwardly on the same plane as the ring of the grounding member.[268]



PPC argues the first alternate embodiment, the fourth alternate embodiment, and sixth alternate embodiment also have lugs.[269]  The first alternate embodiment has "optional internal lugs that contact the outer diameter of the non-shoulder portion of the tubular post."[270]  Similar to the third alternate embodiment, this embodiment depicts an axially flat, washer-like ring.  The optional internal lugs (605 in the diagram below) are depicted as axially flat rounded projections that extend inwardly towards the tubular post on the same plane as the ring portion of the grounding member.  Recall that this embodiment also features fingers (603 in the diagram below) which are projections that extend at an angle away from the radial plane of the grounding member.  Thus, when the grounding member is upright and viewed on its side, the fingers (603) can be seen extending at an

---

[268] *See generally* the discussion in Section X for explanation of "radially flat" versus "axially flat."

[269] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 40–41.

[270] '990 Patent, col. 8 ll. 16–17.

angle away from the plane of the ring.  But the internal lugs cannot be seen because they are flush with the plane of the ring.



The fourth alternate embodiment describes a grounding member with a "plurality of projections" that are depicted as nub-like projections that extend internally.[271]  The difference with the fourth alternate embodiment is that the ring portion of the grounding member is wider axially (and flatter radially) such that it looks more like a wedding ring than a washer.  And the nubs (numbered 918 in the diagrams below) have less axial width than the ring portion and appear to be rounded semi-spheres rather than axially flat projections like in the first and third embodiments.




---

[271] '990 Patent, col. 9 ll. 44–45.

Finally, the sixth alternate embodiment describes a grounding member with a "plurality of projections" extending from one of its side edges "away from the cylindrical surface defined by the band."[272]  These projections extend at an angle away from the plane of the grounding member and are thus not on the same plane as the ring portion of the grounding member.



Ultimately, PPC's point in including these additional embodiments (the fourth and sixth specifically) is to argue that the embodiments do not limit "internal lugs" to "flat" projections that "extend in the same plane as the ring portion of the grounding member."[273]

It is true that the only embodiments that mention "internal lugs" are the first and third embodiments.  And both of those embodiments depict the internal lugs the same way.  They are axially flat projections around the inside of an axially flat, washer-like ring.  And they project inwardly on the same plane as the ring (rather than at an angle away from the ring), such that the grounding member has a consistent axial width when the grounding member is upright and viewed on its side.

However, the fifth alternate grounding member also has inward projections that project on the same plane as the ring.  Although they are not labeled "internal lugs" specifically, the Court

---

[272] '990 Patent, col. 10 ll. 16–20.

[273] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 40–41.

finds that these projections are otherwise consistent with how "internal lugs" is used elsewhere in the specification.  But unlike the "internal lugs" in the first and third embodiments, these projections are rounded three-dimensionally such that they look more like semi-spheres than the axially flat projections that the patent depicts elsewhere.  Because the Court finds that these are still internal lugs, the portion of PVM's construction that requires lugs to be "flat projections" is inaccurate.  The Court will simply construe them as "projections" instead.

Although the projections do not have to be flat, the portion of PVM's construction that requires the projections to extend in the same plane as the ring is appropriate.  As described above in Section XI, the angled projections on the sixth alternate grounding member are better described as fingers than lugs.  So the only embodiments where what the Court considers lugs appear is the first, third, and fourth embodiments (the fifth alternate grounding member, specifically).  In all of these embodiments, the lugs extend in the same plane as the ring such that they do not extend the axial width of the grounding member when it is standing upright and viewed from its side.  And in the first alternate embodiment, the lugs are distinguished from the fingers, which extend at an angle.

Given the foregoing, the Court will adopt the following construction: "Internal lugs" are "projections around the inner perimeter of the ring portion of the grounding member that extend inwardly in the same plane as the ring portion of the grounding member (rather than at an angle away from the plane of the ring)."

## XV.   "approximates a hollow cylinder"; "approximates a section of a hollow cylinder"

The terms at issue state that the grounding member comprises a band that "approximates a section of a hollow cylinder" or "approximates a hollow cylinder."[274]  PVM argues that these terms

---

[274] Joint Claim Chart (Doc. 31) at 5.

are indefinite.[275]   PPC argues that these terms should be construed as a "hollow cylindrical section."[276]

The arguments in this section are very similar to the arguments discussed in Sections V and XII regarding the shape of the grounding member.  PVM argues that "approximates" is a term of degree and neither the claims nor the specification provide meaningfully precise boundaries for that term.[277]  PVM also argues that PPC's proposed construction impermissibly reads the word "approximates" out of the term phrase.[278]

PPC argues that the specification makes clear what these terms mean.[279]  The use of the word "approximates" is simply to account for the fact that the specification prefers a grounding member that is "out-of-round, and more preferably oblong, rather than circular, in order to ensure reliable electrical contact with both the coupler and the tubular post."[280]  And the two embodiments that discuss this shape have figures with a C-shape ring rather than a full circle.[281]  Thus, the shape does not mirror a perfect cylinder.

Moreover, PPC argues that the use of a term of degree does not make the terms indefinite because the specification and claim limitations provide a number of guideposts that would allow a person of ordinary skill in the art to discern the scope of the shape that the grounding member must have.[282]  For example, PPC cites to claim 6 of the '126 Patent, which requires that the

---

[275] *Id.*

[276] *Id.*

[277] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 28–29.

[278] *Id.*

[279] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 41–45.

[280] '990 Patent, col. 3 ll. 27–30.

[281] '990 Patent, col. 9 ll. 12–14, 23–24, col. 10 ll. 8–10, fig. 9B, fig. 11A.

[282] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 41–45.

grounding member is disposed between the tubular post and the coupler, and that the grounding member provides an electrically-conductive path between the coupler and the tubular post while the coupler rotates around the tubular post.[283]  And the specification makes clear that the coupler and the tubular post are all round objects.[284]  Further, it clarifies that the grounding member must maintain contact between these objects without preventing the rotation of the coupler.[285]  Essentially, PPC's point is that the curvature of the grounding member has to be such that it can fit between two round objects (the tubular post and the coupler) and maintain contact between these two round objects while still allowing the coupler to rotate.  Any object that would not perform these functions would not be covered by the term "approximates a hollow cylinder."  And so, according to PPC, the Patents provide a clear delineation of the scope of the term.[286]

PVM's argument that the terms "approximates a section of a hollow cylinder" or "approximates a hollow cylinder" are indefinite is unpersuasive.  The Patents provide numerous guideposts that elucidate the scope of the term such that "approximates" is not an indefinite term of degree.  In the specification, the grounding member is described as having a "general circular shape" that "approximates a section of a hollow cylinder."[287]  Further, the claim at issue in the '612 Patent states that "the generally arcuate shaped member comprises a circumferential metallic band; and the circumferential band has a general circular shape and approximates a section of a hollow cylinder."[288]  And the claim at issue in the '126 Patent states that the grounding member

---

[283] '126 Patent, col. 12 l. 63–col. 13 ll. 1–24.

[284] '990 Patent, fig. 2; fig. 3C.

[285] '990 Patent, col. 3 ll. 14–20.

[286] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 41–45.

[287] '990 Patent, col. 9 ll. 22–24.

[288] '612 Patent, col. 12 ll. 61–64.

"comprises a circumferential band comprising a section that approximates a hollow cylinder."[289]
Thus, the Patents indicate that the grounding member has a circumferential band with a general
circular shape.  And this band approximates a section of a hollow cylinder.  So the shape of the
hollow cylinder must be generally circular and circumferential.  As described above in Section
XII, generally circular means "at least part of a circular shape that can be out-of-round or oblong,
but not square, hexagonal, octagonal, or oval."  And as described below in Section XX, a
circumferential band is "a circle-shaped piece of metal with first and second side edges that extend
along its circumference."  Thus, as described in the Patents, a shape that approximates a hollow
cylinder is a shape that is circle-shaped (but not necessarily a perfect circle), and is not a square,
hexagon, octagon, or oval.

        To the extent that there is still ambiguity regarding the meaning of the terms "approximates
a section of a hollow cylinder" or "approximates a hollow cylinder," the Patents provide a clear
scope of the terms.  The grounding member has to be shaped such that it can fit between two round
objects (the tubular post and the coupler) and maintain contact between these two round objects
while still allowing the coupler to rotate.  This significantly narrows the number of possible shapes
that the grounding member can take, as small variations could impact the ability of the invention
to function.  That is, small variations could impact the ability of the grounding member to maintain
contact with the tubular post and the coupler while still allowing the coupler to rotate.  So, the
Court finds that there are sufficient guideposts in the specification for discerning the meaning of
the terms, such that they have a clear scope and are not indefinite.[290]

---

[289] '126 Patent, col. 13 ll. 21–23.

[290] *See supra* note 127.

However, PVM is correct that PPC's proposed construction removes the word "approximates" from the terms. And the term "approximates" is pivotal because it indicates that the shape of the grounding member is not a perfect cylinder but can be oblong or out-of-round. Thus, the Court will modify the construction to take account of the full-term phrases. The construction will be "forming at least part of a section of a hollow cylindrical shape that can be out-of-round or oblong (rather than perfectly circular), but not square, hexagonal, octagonal, or oval."

## XVI.   "electrically contacts"

The claim at issue states that "the grounding member electrically contacts the annular recess of the nut and the axially extending outer surface of the flange of the post so as to provide a ground path between the nut and the post."[291] PVM contends that the term "electrically contacts" in this claim is indefinite.[292] PPC contends that the term is definite and should be construed as "touches to form an electrical path."[293]

PVM argues that the term "electrically contacts" is indefinite because, according to PVM, "electrically" is a term of degree that is not defined in the specification.[294] In support of this argument, PVM cites the specification, which describes that, in a loose connection system, "an alternate ground path may fortuitously result from contact between the coupler and the tubular post."[295] And this invention was designed to solve this problem by providing a reliable ground path. So "electrically contacts" as used in this invention must mean more than the mere fortuitous

---

[291] '612 Patent, *Ex Parte Reexamination*, col. 2 ll. 12–15.

[292] Joint Claim Chart (Doc. 31) at 5.

[293] *Id*.

[294] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 29–30.

[295] *Id*.

contact that this invention was designed to improve upon.  But, according to PVM, the specification does not provide any guideposts for how much contact qualifies.[296]  On the other hand, PPC argues that the specification makes clear that electrical contact requires both physical engagement/touching, and the forming of an electrical path.[297]  And thus the relevant question to ask when determining if there has been electrical contact is whether the grounding member "touches to form an electrical path."

PVM has not met its burden to show that this term fails to inform those of ordinary skill in the art about the scope of the invention with reasonable certainty.  The term phrase is clear, especially in light of the specification.  The specification states that this grounding member must contact the nut in order for an electric path to flow through the grounding member to the nut.  Thus, the grounding member must contact the nut.  And the type of contact must be an electric one.  Thus, "electrically" is not a term of degree, it is simply describing the type of contact that the grounding member must make.  Nothing in this claim language suggests that the grounding member must only electrically contact the nut sometimes or part of the time.  Thus, the Court will construe "electrically contacts" to mean "touches to form a constant electrical path."

## XVII.  "an electrically-conductive grounding component"

The term phrase at issue is "an electrically-conductive grounding component."[298]  PVM says that this term phrase is indefinite.  PPC says that this term phrase should be construed as "an electrically-conductive component that forms a ground path."[299]

---

[296] *Id.*

[297] Pl.'s Claim Construction Br. (Doc. 33) at 41–42.

[298] Joint Claim Chart (Doc. 31) at 5.

[299] *Id.*

PVM argues that the term phrase is indefinite because it lacks antecedent basis in the specification.[300]  PVM points out that an electrically-conductive grounding component is not described anywhere in the specification.  The specification only mentions an electrically-conductive grounding member or electrically-conductive grease.[301]

PPC says this term phrase is clear because, although "grounding component" isn't used anywhere in the specification, a person of ordinary skill in the art could determine what a grounding component is from the rest of the specification and the claims.[302]  PPC notes that the surrounding claims describe that the component is located between the post and the coupler, that it contacts both the post and the coupler to provide an electrically-conductive grounding path, and that it is either an arcuately-shaped grounding member or electrically-conductive grease.  Indeed, PPC points out that claim 6 of the '455 Patent, which depends on claim 5, says that the "electrically-conductive grounding component is at least one of a resilient electrically-conductive grounding member and electrically-conductive grease."[303]

PVM disagrees that the component is limited to either a grounding member or electrically-conductive grease.  PVM argues that while claim 6 may limit the grounding component to "at least one of a resilient electrically-conductive grounding member and electrically-conductive grease," claim 5 of the '455 Patent is not so limited.[304]  Essentially, PVM is arguing that claim 6 does not provide the outer bounds of what a grounding component is.  Instead, claim 6 simply limits the component to those two possibilities in that one claim only.  PVM also argues that the fact that

---

[300] *Id.*; Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 31.

[301] *See, e.g.*, '990 Patent, col. 4 ll. 4–6.

[302] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 48–50.

[303] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 13–15; '455 Patent, col. 13 ll. 14–17.

[304] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 11–12, 17.

PPC conceded in its brief that the grounding component could be a piece of iron ore, a metal spring, a metal ball, or a crumpled aluminum foil gum wrapper suggests the scope of component is much broader than just a grounding member or electrically-conductive grease.[305]  According to PVM, this makes the scope of the term overly broad and thus indefinite.[306]

The Court agrees with PVM that the term grounding component appears to embrace more than just a grounding member or electrically-conductive grease.  However, the Court does not agree that this makes the term indefinite.  The surrounding claims and the specification make clear to a person of ordinary skill in the art what the grounding component is.  It is located between the post and coupler, it makes electrical contact between these two objects for forming a ground path, and it needs to be shaped to fit inside the connector in such a way that it can maintain contact while still allowing the coupler to rotate.  Thus, the Court will define "an electrically-conductive grounding component" as "any object that is both electrically-conductive and able to form a ground path."

## XVIII. "a tubular post grounding path portion"; "a coupler grounding path portion"

The Court will address these two terms together because they involve the same claims and the same concept.  PVM argues that both terms are indefinite.[307]  PPC argues that "a tubular post

---

[305] *See id.*  *See also* Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 49–50 ("Defendant asks a series of rhetorical questions about the scope of a grounding component: 'Does it include anything that is capable of conducting electricity?  A piece [of] iron ore?  A metal spring?  A metal ball?  A graphic structure?  A crumpled aluminum foil gum wrapper?' . . . The answer is that a grounding component could be all of these things so long as it was shaped to fit inside the connector and allow the coupler to rotate, conduct electricity, is 'disposed between the tubular post and the coupler,' 'reliably contacts both the tubular post grounding path portion and the coupler grounding path portion to provide a stable and reliable electrically-conductive grounding path between the tubular post grounding path portion and the coupler grounding path portion when a gap between the tubular post and the equipment port exists while the coupler is engaged with the equipment port', is, in the case of [C]laim 7, 'an arcuately shaped resilient electrically-conductive grounding member configured to extend around the tubular post over at least 225 degrees', is, in the case of [C]laim 8, engaged and retained in the annular recess of the coupler, and is, in the case of [C]laim 15, 'retained between the tubular post and the coupler.'").

[306] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 11–12, 17.

[307] Joint Claim Chart (Doc. 31) at 5–6.

grounding path portion" should be construed as "a portion of the tubular post that contacts the electrically-conductive grounding component," and that "a coupler grounding path portion" should be construed as "a portion of the coupler that contacts the electrically-conductive grounding component."[308]

PPC argues that the specification and claims at issue teach that the grounding member sits between the tubular post and the coupler to form an electrical ground path.[309]  For example, the relevant claim language states that the "tubular post grounding path portion" has an "outer surface" and the "coupler grounding path portion" has an "inner surface."[310]  The claim then states that "the electrically-conductive grounding component reliably contacts both the tubular post grounding path portion and the coupler grounding path portion to provide a stable and reliable electrically-conductive grounding path between the tubular post grounding path portion and the coupler grounding path portion . . . ."[311]  Thus, according to PPC, the tubular post grounding path portion and coupler grounding path portion are simply the portion of the post and coupler that is in contact with the grounding member.[312]

PVM argues that this term is indefinite because the term "grounding path portion" is not mentioned or defined anywhere in the Patents.[313]  So a person of ordinary skill in the art would be confused upon seeing that term appear for the first time in the claim.[314]  PVM further says that, even if it concedes that a person of ordinary skill in the art could discern from the specification

---

[308] Joint Claim Chart (Doc. 31) at 5–6.

[309] *See, e.g.*, '990 Patent, col. 3 ll. 16–18 (noting that the "grounding member engages both the tubular post and the coupler for providing an electrically-conductive path therebetween").

[310] '455 Patent, col. 13 ll. 1–4.

[311] '455 Patent, col. 13 ll. 5–11.

[312] Pl.'s Claim Construction Br. (Doc. 33) at 44–47.

[313] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 32–33.

[314] *Id.*

that the grounding path portion is the part of the post and nut that make contact with the grounding member, the term is still indefinite.  That's because the actual location of that contact with the post and nut varies across the embodiments.[315]

The Court concludes that, even though neither a tubular post grounding path portion nor coupler grounding path portion are mentioned in the specification, the meanings of such terms are reasonably ascertainable from the specification.[316]  As PPC points out, the specification makes clear that the key feature of the invention is the electrical grounding connection that is made between the tubular post and the coupler.  And the way this grounding connection is made is via a grounding member which makes contact with both the tubular post and the coupler.  It is clear that the portion of the post and coupler that the grounding member touches to maintain that grounding path is the "grounding path portion."  Thus, these terms are not indefinite.  The Court will adopt PPC's constructions.  "[A] tubular post grounding path portion" will be construed as "a portion of the tubular post that contacts the electrically-conductive grounding component."  And "a coupler grounding path portion" will be construed as "a portion of the coupler that contacts the electrically-conductive grounding component."[317]

## XIX.   "reliably contacts"; "a stable and reliable electrically-conductive grounding path"

These two term phrases are discussed together because they relate to the same claims and the same concept.  The relevant claim language at issue states that the "electrically-conductive grounding component reliably contacts both the tubular post grounding path portion and the

---

[315] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 19.

[316] *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) (noting that a claim is not indefinite "if the scope of [the] claim would be reasonably ascertainable by those skilled in the art").

[317] The "electrically-conductive grounding component" portion of these constructions was not at issue in these term phrases.  However, to the extent it is necessary, those terms should be construed consistent with the Court's construction of that term in Section XVII.

coupler grounding path portion to provide a stable and reliable electrically-conductive grounding path between the tubular post grounding path portion and the coupler grounding path portion."[318] PVM says that "reliably contacts" and "a stable and reliable electrically-conductive grounding path" are indefinite terms.[319]  PPC says that "reliably contacts" means "maintains contact" and "a stable and reliable electrically-conductive grounding path" means "a path that maintains ground."[320]

PVM argues that both of these term phrases are indefinite because they use terms of degree—"reliably," "reliable," and "stable"—that are not defined in the specification.[321]  Similar to "electrically contacts" (discussed *supra* Section XVI), PVM cites the specification, which describes that, in a loose connection system, "an alternate ground path may fortuitously result from contact between the coupler and the tubular post."[322]  And this invention was designed to improve on this problem by providing a reliable ground path.[323]  So "reliably," "reliable," and "stable" must mean more than the mere fortuitous contact that this invention was designed to improve upon. But, according to PVM, the specification does not provide any guideposts for how much contact qualifies.[324]  In essence, PVM's argument is that not every contact or grounding path is stable and reliable, and the Patents do not make clear when a contact or grounding path becomes stable and reliable.

---

[318] '455 Patent, col. 13 ll. 5–11.

[319] Joint Claim Chart (Doc. 31) at 6.

[320] *Id.*

[321] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 34–35.

[322] Def.'s Claim Construction Br. (Doc. 32) at 58–60.

[323] *Id.*

[324] *Id.*

PPC argues that these term phrases simply mean to "maintain" contact or "maintain" a grounding path.[325]  PPC says that the problem the invention was designed to solve was that the grounding path between the connector and the port was intermittent.[326]  Thus, to prevent this intermittent connection, the invention was designed to maintain a stable and reliable ground path from the post through the connector via a grounding member.[327]  In PPC's view, a stable and reliable connection is the opposite of intermittent; it is maintained 100% of the time.[328]

PVM argues that PPC's construction of "reliable" as "maintains" is superfluous because the specification states that the "coaxial cable connector . . . *maintains* a *reliable* ground path between the coupler and the tubular post . . . ."[329]  Because the statement uses both "maintains" and "reliable" in the same sentence, PVM says the inventors understood these terms to have different meanings.

PVM has not met its burden of showing that these terms are indefinite.  The specification details the scope of the terms such that a person of ordinary skill in the art would be informed of the scope of the invention with reasonable certainty.  The specification states that a reliable electrical connection can be achieved by ensuring the coupler is fully tightened over the port.[330] When that occurs, the tubular post "directly engages" the connection port thereby making a "direct electrical ground connection."[331]  This connection is reliable because the post makes direct contact with the port such that an electrical ground path can flow through to the port unimpeded.  Thus,

---

[325] Pl.'s Claim Construction Br. (Doc. 33) at 47–48.

[326] *Id.*

[327] *Id.*

[328] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 21.

[329] '990 Patent, col. 2 ll. 51–52.

[330] '990 Patent, col. 1 ll. 51–59.

[331] *Id.*

the specification teaches that a "reliable electrical connection" is one that results when a direct electrical ground connection is made such that a ground path can flow through unimpeded.

On the other hand, the specification discusses an unstable ground path.[332]   This occurs when the coupler is not drawn tightly to the appliance port and so there is a gap between the tubular post and the connection port such that there is no direct electrical ground connection.[333]   In this loose connection system, a ground path may result from fortuitous contact between the coupler and the tubular post or from fortuitous contact between the coupler and the outer body of the connector.[334]   However, this path is unstable because it may be disrupted "as a result of vibrations, movement of the appliance, movement of the cable, or the like."[335]

So the distinction that the specification draws between a reliable ground path and an unstable ground path is that a reliable ground path results from a direct electrical ground connection that is not disrupted by vibrations, movement of the appliance, movement of the cable, or the like.   And while an unstable ground path may happen fortuitously, it is not the result of constant, direct electrical engagement and so it is easily lost.   This distinction provides enough of a scope of the meaning of the term to survive an indefiniteness challenge.   Moreover, this distinction is consistent with PPC's argument that a stable and reliable grounding path is a grounding path that is maintained 100% of the time.[336]   Applying this understanding to the terms at issue here, the Court will construe "a stable and reliable electrically-conductive grounding path"

---

[332] '990 Patent, col. 2 ll. 23–24, 36–38.

[333] '990 Patent, col. 1 l. 51–col. 2 l. 4.

[334] '990 Patent, col. 2 ll. 20–31.

[335] '990 Patent, col. 2 ll. 23–26.

[336] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 21.

as "a path that maintains a constant ground that is never disrupted by vibrations, movement of the cable-box port, movement of the cable, or the like."

Further, the specification and the relevant claims teach that the way that this grounding path is maintained is via a grounding member that is placed between the tubular post and the coupler.[337]  The grounding member allows the grounding path to flow through the coupler when the tubular post is not fully tightened to the port.  It does this by being in direct contact with both the tubular post and the coupler.  This allows the grounding path to flow from the post, through the grounding member, and through the coupler to the port.  So even if the tubular post is not in direct contact with the port (because of a loose connection), the grounding member facilitates a direct contact with the port through the coupler.  But this grounding path is only possible if the grounding member maintains contact with the tubular post and the coupler.  That is, "a stable and reliable electrically-conductive grounding path" is only ensured if the grounding member maintains constant contact with both the tubular post and the coupler.  Thus, consistent with how the Court construed "a stable and reliable electrically-conductive grounding path," the Court construes the term "reliably contacts" to mean "maintains a constant contact that is not disrupted by vibrations, movement of the appliance, movement of the cable, or the like."

## XX.   "a circumferential band"; "a circumferential metallic band"

The parties dispute the meaning of "a circumferential band" and "a circumferential metallic band" as used in several places in the Patents to describe the grounding member.[338]  The relevant claim language at issue states that the grounding member "comprises a circumferential band comprising a section that approximates a hollow cylinder, the circumferential band having first

---

[337] *See, e.g.*, '990 Patent, col. 3 ll. 14–20; '455 Patent, col. 12 l. 47–col. 13 l. 13.

[338] Joint Claim Chart (Doc. 31) at 6.

and second opposing side edges;" and "the generally arcuate shaped member comprises a circumferential metallic band; and the circumferential metallic band has a general circular shape and approximates a section of a hollow cylinder that extends between first and second opposing ends."[339]

PVM argues that the construction for both terms should be "[a] circle-shaped piece of metal with first and second side edges that extend along its circumference and first and second radial walls that extend radially away from the first and second side edges."[340] PVM derives this construction from the specification. Specifically, PVM's definition comes from the description of the fourth alternate grounding member.[341] According to PVM, the fourth alternate grounding member is the only embodiment that is described as a circumferential band.

PPC argued in its briefing and Joint Claim Construction Chart that the construction for "a circumferential band" should be "a curved strip" and that the construction for "a circumferential metallic band" should be "a curved strip made of a metallic material."[342] However, at the *Markman* hearing, PPC conceded that the first part of PVM's construction was accurate.[343] That part of the construction is "a circle-shaped piece of metal with first and second side edges that extend along its circumference." However, PPC objects to the second part of the construction. Specifically, that there are "first and second radial walls that extend radially away from the first and second side edges." With respect to this part of the construction, PPC argues that PVM is improperly reading in a limitation to the claim from a specific embodiment (the fourth alternate grounding member).[344]

---

[339] '126 Patent, col. 12 ll. 60–65; col. 13 ll. 20–23.

[340] Joint Claim Chart (Doc. 31) at 6.

[341] Def.'s Claim Construction Br. (Doc. 32) at 60–61.

[342] Joint Claim Chart (Doc. 31) at 6.

[343] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 22–23.

[344] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 56–57.

Given PPC's concession, the Court will adopt the first part of PVM's construction. However, the Court agrees with PPC that the second part of the construction is an improper limitation.  PVM is wrong that the fourth alternate grounding member is the only embodiment that describes a circumferential metallic band.  The sixth alternate grounding member is also described as including a "circumferential metallic band extending between first and second opposing ends."[345]   Notably, this embodiment makes no mention of "radial walls."   Thus, the term "circumferential metallic band" does not automatically import requirements regarding radial walls. So the Court will omit that part of PVM's proposed construction.  The Court will construe "a circumferential band" and "a circumferential  metallic band" as "a circle-shaped piece of metal with first and second side edges that extend along its circumference."

## XXI.   "a radial grounding member"

The parties have submitted competing constructions of the term "a radial grounding member."[346]  That term is used to describe the grounding member in claim 10 of the '126 Patent.[347] PVM's proposed construction is "a thin flat ring."[348]  PPC's proposed construction is "a grounding member that projects radially relative to the axis of the connector."[349]

PVM argues that its construction is consistent with the second alternate embodiment, which is the only place the term "a radial grounding member" is used.[350]  PPC argues that this improperly limits the claim to one embodiment.  According to PPC, the first, second, third, fourth, and sixth embodiments all depict radial grounding members even if they are not described explicitly as such.

---

[345] '990 Patent, col. 10 ll. 6–8.

[346] Joint Claim Chart (Doc. 31) at 6.

[347] '126 Patent, col. 14 ll. 26–27.

[348] Joint Claim Chart (Doc. 31) at 6.

[349] *Id.*

[350] Def.'s Claim Construction Br. (Doc. 32) at 61–62.

And while the first and second alternate embodiments are flat, the fourth and the sixth alternate embodiments are not.[351]  The one thing that they all have in common, according to PPC, is that they project radially relative to the axis of the connector.

PPC has the better of the argument.  While the term "radial grounding member" only appears in the second alternate embodiment, the feature being described is present in the first, third, fourth, and sixth alternate embodiments.  Indeed, every time a grounding member is depicted in the specification, it is depicted as projecting radially relative to the axis of the connector.  The fact that the words "radial grounding member" are not explicitly used to describe these grounding members is not sufficient to indicate that they are not radial grounding members.  Nor does this omission show that the patentee expressly disavowed that "a radial grounding member" could include these other embodiments, or that the patentee clearly defined "a radial grounding member" as something that excluded these other embodiments.[352]  Thus, PVM's construction reads limitations into the claim language from the specification that are unwarranted.

PVM's construction of "a thin flat ring" appears to be derived entirely from the second embodiment.  However, as discussed above, the fourth and sixth alternate embodiments depict rings that are not flat in the same way as the second alternate embodiment.  So the requirement in PVM's construction of a thin flat ring is overly narrow.  PPC's construction of "a grounding member that projects radially relative to the axis of the connector" accurately captures the scope of "a radial grounding member" in the Patents.  Thus, the Court will adopt that construction.

---

[351] Pl.'s Resp. to Def.'s Claim Construction Br. (Doc. 40) at 57–58.

[352] *Thorner*, 669 F.3d at 1365.

**XXII.  "A grounding member for a coaxial cable connector having a post and a nut"**

This term is from the preamble to claim 9 in the '612 Patent discussed in Section VI.  PPC argues that the preamble is non-limiting and so no construction is necessary.[353]  PVM argues that if the preamble is non-limiting, the phrase is indefinite.[354]  PVM also argues that, if the Court finds that the preamble is limiting or that the phrase is not indefinite, that the phrase should be construed in a manner consistent with the Court's constructions in Sections I and II.[355]

As discussed in Section VI, the preamble is limiting.  So the decision now is whether to leave the language as is or further construe the term.[356]  PVM says this term should be construed the same way the Court construed "[a coupler having a first end] rotatably secured over the second end of the tubular post" and "a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler" in Sections I & II.[357]  Essentially, PVM wants the Court to add that the nut be "rotatably secured over the second end of the tubular post and secured directly to the body (as opposed to secured directly to the post only) in a manner that allows the coupler to rotate and that does not allow for the body member to ever lose contact with the coupler" and "a body member secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[358]

---

[353] Joint Claim Chart (Doc. 31) at 6–7.

[354] *Id*.

[355] *Id*.

[356] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 31 (counsel for PVM conceding that the indefiniteness problem goes away if claim 9 is limiting).

[357] Joint Claim Chart (Doc. 31) at 6–7.

[358] *Id*.

PPC says it would be error to import these constructions because of differences between the '612 Patent (at issue here) and the Patents at issue in the Arizona case.[359]  First, PPC points out that the actual claim language in the '612 Patent is very different.  In the Arizona case, the claims that the Court was construing were (1) "[a coupler having a first end] rotatably secured over the second end of the tubular post" and (2) "a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[360]  Here, the claim recites "a grounding member for a coaxial cable connector having a post and a nut."[361]  With respect to the first claim the Arizona Court construed, PPC further argues that the Arizona Court adopted the construction it did because of the limitation that the body and coupler cannot lose contact.  But no claim in the '612 Patent includes such a limitation.[362]  And with respect to the second claim the Arizona Court construed, PPC notes that the Arizona Court adopted the construction it did because of the language in the claim that the body "extend[ed] about the first end of the tubular post."  However, that language is not in the '612 Patent.[363]

According to PVM, these additions are necessary to clarify what a post and a nut are.  It is insufficient to simply say that the connector has a post and a nut without also stating that the nut must be attached to the body and that the body extends at least as far as the post.[364]  PVM says that

---

[359] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 26–27.

[360] *See supra* Sections I & II.

[361] Joint Claim Chart (Doc. 31) at 6–7.

[362] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 26–27.

[363] *Id.*

[364] Def.'s Resp. to Pl.'s Claim Construction Br. (Doc. 41) at 47.

the fact that these are different patents doesn't matter; the embodiments and figures/invention are the same here, so the definitions need to be the same here as they are in the '990 Patent.[365]

Overall, the Court finds PPC more persuasive.  Aside from involving a post and a nut, the terms at issue are markedly different from the terms that the Court construed in Sections I and II. And the Patents at issue are different in ways that are key to the Court's constructions in those sections.  Thus, importing those additional limitations from a different patent into the Patent at issue here would be erroneous.  Moreover, PVM concedes that this term phrase is not indefinite, and the Court does not find that "a grounding member for a coaxial cable connector having a post and a nut" is ambiguous in any way that warrants further construction.  The specification is littered with details on what a post and a nut are such that a person of ordinary skill in the art would have no difficulty understanding what was meant by these terms.  Thus, the Court finds that this term phrase is not indefinite and is not in need of any further construction.

## XXIII. "a nut, a post"

The parties presented the same arguments for this term that they did for the previous term in Section XXII.[366]  So the Court finds that this term phrase is not indefinite and is not in need of any further construction for the same reasons discussed in Section XXII.

IT IS SO ORDERED this 2nd day of August 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[365] June 29, 2023 Hr'g Tr. Pt. II (Rough) at 26–27.

[366] Joint Claim Chart (Doc. 31) at 6–7.