IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**PPC BROADBAND, INC.**                                                      **PLAINTIFF**

**v.**                      **Case No. 4:22-cv-00163-LPR**

**PERFECTVISION MANUFACTURING, INC.**                           **DEFENDANT**

## ORDER

This is (primarily) a patent-infringement case. Plaintiff PPC Broadband, Inc. ("PPC") is the owner of the "Bence Patents," a set of five patents pertaining to the design of coaxial cable connectors.[1] PPC sued Defendant PerfectVision Manufacturing, Inc. ("PVM"), alleging that PVM infringed on the Bence Patents.[2] PVM then filed Counterclaims, alleging (*inter alia*) that PPC has monopolized or attempted to monopolize the relevant market in violation of Section 2 of the Sherman Act.[3]

Today's Order addresses PPC's pending Motion for Partial Judgment on the Pleadings.[4] In that Motion, PPC seeks judgment in its favor on PVM's Sherman Act claims. For the reasons discussed below, the Motion is GRANTED. But the Court gives PVM 30 days from the date of this Order to file a motion for leave to amend its Sherman Act claims if PVM believes it can remedy the deficiencies discussed herein.

---

[1] Pl.'s Compl. (Doc. 1) ¶¶ 13–17; Def.'s Answer (Doc. 20) ¶¶ 13–17. In the parties' briefing, Plaintiff calls these patents the "Patents-in-Suit," whereas Defendant calls them "the Bence Patents." See Pl.'s Br. in Supp. of Mot. for J. on the Pleadings (Doc. 35) at 1; Def.'s Br. in Opp'n to Pl.'s Mot. for J. on the Pleadings (Doc. 37) at 2 (hereinafter using the page numbers that correspond to the parties' briefing pagination). Both terms refer to the same single, continuous family of five patents: U.S. Patent No. 7,114,990 (the "'990 Patent"), U.S. Patent No. 7,479,035 (the "'035 Patent"), U.S. Patent No. 7,955,126 (the "'126 Patent"), U.S. Patent No. 8,172,612 (the "'612 Patent"), and U.S. Patent No. 10,756,455 (the "'455 Patent"). See Pl.'s Compl. (Doc. 1) ¶¶ 13–17; Def.'s Answer (Doc. 20) ¶¶ 13–17.

[2] Pl.'s Compl. (Doc. 1) ¶¶ 27–51.

[3] Def.'s Countercls. (Doc. 20) ¶¶ 41–47.

[4] Doc. 34.

I.  **BACKGROUND**

Because this is a motion for judgment on the pleadings, the facts in this Background Section are drawn almost exclusively from PVM's Counterclaims.[5]

A.  **Overview of the Technology and Relevant Market**

PVM and PPC "both design, make and sell a variety of products used in the Cable Television industry, including coaxial cable connectors."[6] Coaxial cables transmit radio frequency (RF) signals, which are used in cable television systems to provide television, telephone, and internet services to subscribers.[7] These signals are carried through local utility poles down "to the subscriber's residence through a service drop line[,] into a distribution box on the exterior of the subscriber's residence[,] and then into the home."[8] F-type coaxial cable connectors "are used to make connections within the system . . . ."[9]

"The integrity of these connections is important."[10] The FCC regulates signal leakage (or egress), such that cable companies like Comcast "are required to have periodic, ongoing programs to monitor, inspect, locate and repair RF signal leaks."[11] Moreover, well-connected cables minimize the ability for spurious signals to interfere (or ingress) with the RF signals and degrade the quality of the cable services.[12] Often, undesired signal egress and ingress are caused by loose F-type coaxial cable connectors that were never properly installed or that have loosened over time

---

[5] *See infra* pp. 6–7 (laying out the legal standard applicable to Rule 12(c) motions, including the need to accept as true the nonmoving party's factual allegations).

[6] Def.'s Countercls. (Doc. 20) ¶ 6.

[7] *Id.* ¶ 7.

[8] *Id.* ¶ 8.

[9] *Id.* ¶ 9.

[10] *Id.* ¶ 10.

[11] *Id.* ¶¶ 11–12.

[12] *Id.* ¶ 13.

due to vibration.[13]  To minimize this undesired signal egress and ingress, cable companies purchase "continuity" F-type coaxial cable connectors.[14]  These types of connectors "are designed to minimize the problems associated with loose connectors."[15]

PVM alleges that PPC maintains a market share in excess of 80% of the relevant market—"the U.S. market for 'continuity' F-type connectors."[16]  PVM also says that "[s]uppliers within the relevant market are very limited, and notably, have reduced overtime because of consolidation, bankruptcy and the like," and that "the barriers to entry are sufficiently high that new market participants have not entered the relevant market and are unlikely to do so in the foreseeable future."[17]  According to PVM, "PPC's market share, combined with the limited number of suppliers and high barriers to entry, gives PPC market power within the relevant market," which allows PPC to control prices and exclude competition.[18]

### B. History of the Bence Patents and Related Litigation

Although the instant case started in 2022, the genesis of this dispute has an older vintage. On October 15, 2012, Corning Gilbert Inc. ("Corning") filed a complaint in the District of Arizona against PPC for patent infringement.[19]  Corning alleged that PPC's connectors infringed two of

---

[13] *Id.* ¶ 15.

[14] *See id.* ¶ 16.

[15] *Id.*

[16] *Id.* ¶ 17.

[17] *Id.* ¶ 18.  PVM's allegations do not specify (1) what "very limited" means with respect to the number of suppliers, (2) when a new market participant last entered the market, or (3) what the "foreseeable future" means with respect to the lack of new market entrants.  *See id.*  The resulting vagueness of these allegations is only saved—as explained later in this Order—by the allegation that PPC maintains more than an 80% market share in the relevant market.  *See id.* ¶ 17; *infra* p. 8.

[18] Def.'s Countercls. (Doc. 20) ¶¶ 42–43.

[19] *Id.* ¶ 20; Pl.'s Answer to Countercls. (Doc. 23) ¶ 20.  The case was originally captioned *Corning Gilbert Inc. v. John Mezzalingua Assocs., Inc.*, No. CV-12-2208-PHX-SMM, where the defendant was doing business as PPC.  Def.'s Countercls. (Doc. 20) ¶¶ 20–21; Pl.'s Answer to Countercls. (Doc. 23) ¶¶ 20–21.  The docket was later modified to reflect the updated names of both parties—John Mezzalingua Associates, Inc. had become PPC Broadband, Inc., while Corning Gilbert Inc. had changed its formal corporate name and begun doing business as Corning Optical Communications RF, LLC.  *See* Notice of Name Change, *Corning Optical Communications RF LLC v. PPC*

the Bence Patents—the '990 Patent and the '612 Patent.[20] In response, PPC—represented by the same two lawyers as in the instant lawsuit—filed an Answer and Counterclaims alleging that (1) PPC did not infringe the two patents and (2) the two patents were invalid.[21]

In that prior Arizona litigation, PPC successfully convinced the Arizona court to adopt two claim constructions relevant to the instant case. First, as advocated by PPC, the Arizona court construed the phrase "rotatably secured over the second end of the tubular post" to mean that the coupler is "rotatably secured over the second end of the tubular post by attachment to the body in a manner that allows the coupler to rotate."[22] Second, PPC successfully convinced the Arizona court to construe "a body member secured to the tubular post and extending about the first end of the tubular post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler" to mean that the body member is "secured to the tubular post and extending axially at least as far as the first end of the post for receiving the outer conductor of the coaxial cable, wherein the body member contacts the coupler."[23]

---

*Broadband Inc.*, No. 2:12-cv-02208-SMM (D. Ariz. Feb. 27, 2014), ECF No. 59; Order Granting Parties' Stipulation to Modify the Case Caption, *Corning Optical Communications RF LLC v. PPC Broadband Inc.*, No. 2:12-cv-02208-SMM (D. Ariz. July 1, 2024), ECF No. 82; Order Granting Parties' Joint Stipulation to Modify the Case Caption, *Corning Optical Communications RF LLC v. PPC Broadband Inc.*, No. 2:12-cv-02208-SMM (D. Ariz. Oct. 21, 2014), ECF No. 100. The Court may and does take judicial notice of these filings for the purpose of understanding the connection between John Mezzalingua Associates, Inc. and the Plaintiff in the instant case. *See* Fed. R. Evid. 201.

[20] Def.'s Countercls. (Doc. 20) ¶ 22; Pl.'s Answer to Countercls. (Doc. 23) ¶ 22.

[21] Def.'s Countercls. (Doc. 20) ¶¶ 23–24. In its Answer to the Counterclaims in the present case, PPC denies these factual allegations. Pl.'s Answer to Countercls. (Doc. 23) ¶ 24. But PPC does nothing to flesh out its denial. *See id.* Nor does PPC mention the invalidity allegation in its Motion briefing. Furthermore, since a Rule 12(c) motion is under consideration and PVM is the nonmoving party, PVM is entitled to have such factual allegations taken as true. *See infra* p. 7. Therefore, the Court will assume for the sake of deciding this Motion that the factual allegations contained within paragraph 24 of PVM's Counterclaims are true.

[22] *See* Def.'s Countercls. (Doc. 20) ¶ 30; Pl.'s Answer to Countercls. (Doc. 23) ¶ 30.

[23] *See* Def.'s Countercls. (Doc. 20) ¶ 32; Pl.'s Answer to Countercls. (Doc. 23) ¶ 32.

Ultimately, the Arizona case ended by way of a Joint Stipulation of Dismissal in early January of 2017.[24] A little more than four years later, on or about April 27, 2021, Corning assigned the Bence Patents to PPC.[25] And nine months or so after that, on January 27, 2022, PPC sent a cease-and-desist letter to PVM, demanding that PVM cease and desist from selling certain coaxial cable connectors because they allegedly infringed on claims in all five of the Bence Patents.[26] It would seem that the cease-and-desist letter did not have its desired effect—because, on February 18, 2022, PPC sued PVM for patent infringement.[27] That lawsuit is the case at bar.

Several weeks later, on March 2, 2022, PPC filed a second patent-related lawsuit against PVM.[28] In the second lawsuit, PPC alleges that PVM is infringing on a non-Bence Patent: U.S. Patent No. 7,188,416 (the "'416 Patent").[29] For its part, PVM argues (among other things) that the second lawsuit violates a Confidential Settlement Agreement that the two companies reached to resolve an older patent-infringement suit brought by PPC against PVM in Minnesota.[30] The

---

[24] *See* Joint Stipulation of Dismissal, *Corning Optical Communications RF LLC v. PPC Broadband Inc.*, No. 2:12-cv-02208-SMM (D. Ariz. Jan. 10, 2017), ECF No. 123.

[25] Def.'s Countercls. (Doc. 20) ¶ 19; Pl.'s Answer to Countercls. (Doc. 23) ¶ 19.

[26] Ex. F (Cease-and-Desist Letter) to Pl.'s Compl. (Doc. 1) at 1; Pl.'s Compl. (Doc. 1) ¶ 26; Def.'s Answer (Doc. 20) ¶ 26. PVM alleges that, in the intervening time period, a PPC customer had requested that PVM participate in a "request for quotation." Def.'s Countercls. (Doc. 20) ¶ 45(a). PPC denies this allegation. Pl.'s Answer to Countercls. (Doc. 23) ¶ 45. However, given that this Order concerns a Rule 12(c) motion, PVM—as the nonmoving party—is entitled to have its factual allegations taken as true, so this allegation is taken as true for the purpose of deciding this Motion. *See infra* p. 7.

[27] *See generally* Pl.'s Compl. (Doc. 1).

[28] *See PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00204-LPR (E.D. Ark. filed Mar. 2, 2022). Although this second lawsuit was originally assigned to then-Chief Judge D. Price Marshall Jr., the matter was transferred to me on April 20, 2023. Order, *PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00204-LPR (E.D. Ark. Apr. 20, 2023), ECF No. 51.

[29] *See* Pl.'s Compl. ¶ 24, *PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00204-LPR (E.D. Ark. Mar. 2, 2022), ECF No. 1.

[30] *See* Def.'s Answer and Countercls. ¶¶ 12–13, 56, *PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00204-LPR (E.D. Ark. Apr. 21, 2022), ECF No. 16.

second lawsuit is in its fairly early stages, with the Court set to soon make a Claim Construction ruling.[31]

## II.   DISCUSSION

In the instant case, PVM claims that PPC has monopolized or attempted to monopolize the relevant market in violation of Section 2 of the Sherman Act.[32] Challenging these claims, PPC argues—by way of its Rule 12(c) Motion for Partial Judgment on the Pleadings—that PVM has not pled enough facts to state plausible claims for relief.[33]

The legal standard used to evaluate a Rule 12(c) motion for judgment on the pleadings is the same as the legal standard used to evaluate a Rule 12(b)(6) motion to dismiss.[34] "To survive a motion for judgment on the pleadings," a counterclaim "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[35] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[36] Those facts must

---

[31] *See generally PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00204-LPR (E.D. Ark. filed Mar. 2, 2022) (case docket).

[32] Def.'s Countercls. (Doc. 20) ¶¶ 41–47.

[33] *See* Pl.'s Br. in Supp. of Mot. for J. on the Pleadings (Doc. 35) at 1.

[34] *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). In its briefing, PVM disagrees with this understanding of Rule 12(c). PVM cites multiple authorities for the proposition that a 12(c) motion places a different, higher burden on the movant. *See* Def.'s Br. in Opp'n to Pl.'s Mot. for J. on the Pleadings (Doc. 37) at 11–13. PVM's position is essentially that a Rule 12(c) motion is more like a motion for summary judgment than a it is like a Rule 12(b)(6) motion. *See id.* at 12. PVM's point seems to be—although it never comes right out and says it—that a Rule 12(c) motion cannot be used to press what is really a Rule 12(b)(6) failure-to-state-a-claim argument. PVM's authorities on this point are interesting, particularly then-District Judge Jackson's discussion of the issue in *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 48 (D.D.C. 2018). But the problem for PVM is that its position is foreclosed by Eighth Circuit precedent. In the Eighth Circuit, a Rule 12(c) motion can be used to advance a failure-to-state-a-claim argument, and such a motion is evaluated under the same standard as is a Rule 12(b)(6) motion. *See Mickelson v. County of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016). This Court is bound by such precedent.

[35] *Mickelson*, 823 F.3d at 923 (internal quotation marks and citations omitted).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"affirmatively and plausibly suggest that the pleader has the right he claims," whereas "facts that are merely consistent with such a right" are insufficient.[37]

When making this plausibility determination, factual allegations in the nonmoving party's pleadings are to be taken as true.[38] But this only goes so far. A court need not accept as true "conclusory statements" or "naked assertions devoid of further factual enhancement."[39] Indeed, the Court "is free to," and absent unusual circumstances should, "ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."[40]

With the foregoing legal standard in mind, we can turn to the monopoly and attempted monopoly claims.

### A. Monopoly

A claim for monopolization under Section 2 of the Sherman Act requires the claimant to prove two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[41]

Element One is split up into two parts. The first part involves defining the relevant market. "A relevant product market is composed of 'commodities reasonably interchangeable by

---

[37] *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).

[38] *Ashley County. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (citing *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).

[39] *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768 (8th Cir. 2012) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678).

[40] *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) (citing *Westcott*, 901 F.2d at 1488); *see also Retro Television Network*, 696 F.3d at 768.

[41] *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

consumers for the same purposes.'"[42]  PVM has adequately alleged facts that make it plausible that the relevant market is the U.S. market for "continuity" F-type coaxial cable connectors. Specifically, PVM's Counterclaims explain how these connectors work, what their use is, and who uses them.[43]  Moreover, PPC does not argue that this is not the relevant market.

The second part of Element One requires PVM to show that PPC has monopoly power within the relevant market.  "The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."[44]  PVM alleges that PPC has a market share in excess of 80% of the U.S. market for "continuity" F-type connectors.[45]  This is the type of fact allegation that must be accepted as true on a Rule 12(c) motion.[46]  And precedents from the U.S. Supreme Court and the Eighth Circuit allow the inference of monopoly power from a market share around 80%.[47]  The Court thus concludes that PVM has plausibly alleged that PPC has monopoly power within the relevant market.

Element Two of a monopoly claim "requires the willful acquisition or maintenance of that [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[48]  PVM's allegations supporting Element Two all

---

[42] *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1277 (8th Cir. 1981) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

[43] Def.'s Countercls. (Doc. 20) ¶¶ 6–18.

[44] *Grinnell*, 384 U.S. at 571.

[45] Def.'s Countercls. (Doc. 20) ¶ 17.

[46] *See supra* p. 7.

[47] *See, e.g.*, *Grinnell*, 384 U.S. at 571 ("In *American Tobacco Co. v. United States*, 328 U.S. 781, 797 [(1946)] we said that 'over two-thirds of the entire domestic field of cigarettes, and over 80% of the field of comparable cigarettes' constituted 'a substantial monopoly.'  In *United States v. Aluminum Co. of America*, [148 F.2d 416, 429 (2d Cir. 1945)], 90% of the market constituted monopoly power.  In the present case, 87% of the accredited central station service business leaves no doubt that the congeries of these defendants have monopoly power . . . ."); *SuperTurf*, 660 F.2d at 1277, 1277 n.3 (finding that Monsanto "clearly dominate[d]" the artificial turf market where its market share ranged from 75% to 81% over a five-year span).

[48] *Grinnell*, 384 U.S. at 570–71.

concern PPC's attempts to enforce its patents.[49]  Although "[a] patent owner who brings a suit for infringement, without more, is generally exempt from the antitrust laws for that action,"[50] patents "may not be used as levers for obtaining objectives proscribed by the antitrust laws."[51]  Accordingly, a patent infringement suit (or attempts to enforce the patent leading up to such a suit) may be the subject of an antitrust violation where "the asserted patent was obtained through knowing and willful fraud" or where "the infringement suit was a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."[52]  PVM has not alleged that the Bence Patents (or any other patents owned by PPC) were obtained through knowing and willful fraud.  So, to avoid judgment on the pleadings, PVM must plead facts sufficient to make it plausible that PPC's attempts to enforce its patents are mere shams designed to interfere with PVM's business relationships.  PVM has not done so, as explained below.

The first allegation of anticompetitive conduct is that, "[a]fter years of silence and inaction by PPC and its predecessor," PPC "only complain[ed] of alleged patent infringement after a customer of PPC requested [PVM] participate in a request for quotation."[53]  There's just not enough meat on the bone here.  The Counterclaims do not allege when PPC found out that PVM was (allegedly) violating the Bence Patents.  So, we don't know if PPC sat on its patent rights or

---

[49] Specifically, building on its assertions in paragraphs 19–40 of the Counterclaims, PVM asserts (in paragraph 45 of the Counterclaims) five instances of conduct that PVM alleges are anticompetitive in nature and thus show PPC's willful acquisition or maintenance of monopoly power.  Although the structure of paragraph 45 suggests that PVM means for the five identified acts to be a non-exhaustive list of PPC's (alleged) anticompetitive conduct, there is no other conduct in the Counterclaim that could even possibly count as anticompetitive.

[50] *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304 (Fed. Cir. 2004).

[51] *Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11 (1972).

[52] *Q-Pharma, Inc.*, 360 F.3d at 1305 (internal quotations and citations omitted).

[53] Def.'s Countercls. (Doc. 20) ¶ 45(a).

not.[54]  The Counterclaims do not allege whether PPC knew its customer had requested PVM's participation in a request for quotation, the length of time between that customer's request and PPC's initial complaints of patent infringement, or whether the customer was big enough to matter to PPC.  So, we can't infer that the request for quotation was the thing that triggered PPC's attempts to enforce the Bence Patents.

The second and third allegations of anticompetitive conduct focus on the January 2022 cease-and-desist letter that PPC sent to PVM.  PVM alleges that PPC sent this letter even though it "conflicts with the claim constructions that PPC had advocated for and secured in" the Arizona litigation.[55]  PVM also alleges that, in issuing this letter, PPC "knowingly and/or recklessly ignore[d] the claim constructions that PPC had advocated for and secured in" the Arizona litigation.[56]  What's missing here is (1) a clear allegation that PPC knew that PVM's products do not infringe the Bence Patents under the constructions PPC requested and secured in the Arizona litigation and (2) facts explaining exactly why and how PPC knew that.  To be fair, some (but not all) of the missing information might be teased out of paragraphs 19–40 of the Counterclaims if one squints long enough at those paragraphs in just the right way.  But PVM has not set out the factual conflicts between the letter and the constructions in the Arizona litigation in a clear (and sufficient) enough way for the Court to be able to plausibly infer that PPC knew PVM's products weren't infringing on the Bence Patents when PPC sent the cease-and-desist letter.

The fourth and fifth allegations of anticompetitive conduct focus on the commencement and pursuit of the instant lawsuit and the commencement and pursuit of the other lawsuit (about

---

[54] The mere fact that a patent holder does not pursue a patent claim quickly does not automatically mean that a later attempt to do so is anticompetitive conduct.  But, in the right case with the right allegations, it could help raise an inference that the patent holder does not really believe the person being sued is infringing on the patent.

[55] Def.'s Countercls. (Doc. 20) ¶ 45(b).

[56] *Id.* ¶ 45(c).

the '416 Patent) in this District. PVM alleges that both constitute sham litigation.[57] A lawsuit is a sham if it (1) is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "conceals an attempt to interfere *directly* with the business relationships of a competitor through use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."[58]

With respect to the instant litigation, paragraph 45 of PVM's Counterclaims does not provide any facts to support its assertion of objective baselessness and subjective anticompetitive motivation. But, based on paragraphs 19–40 and PVM's briefing, it appears that PVM's assertions of baselessness and anti-competitiveness rely on two alleged "facts." First, PVM alleges that PPC argued in the Arizona litigation that the claims in two of the Bence Patents were invalid.[59] Second, PVM alleges that PPC convinced the district court in the Arizona litigation of two claim constructions that PVM believes render their products non-infringing.[60] Neither of these "facts" are enough to plausibly suggest objective baselessness or subjective anticompetitive motivations.

Although PPC (as the alleged infringer before it was assigned the patents) previously argued that the claims in two of the Bence Patents were invalid, PPC's argument did not prevail.[61] So PPC is neither judicially estopped nor somehow morally burdened by its previous claims of invalidity. In any event, in the instant suit, PPC is claiming that PVM is infringing on claims in

---

[57] *See id.* ¶¶ 45(d)–45(e).

[58] *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (internal citations and quotations omitted).

[59] Def.'s Countercls. (Doc. 20) ¶ 24.

[60] *Id.* ¶¶ 25–34.

[61] While PVM does not state explicitly in its pleadings that PPC's attempt to have two of the Bence Patents declared invalid was unsuccessful, PVM does not allege anywhere in its pleadings that any of the Bence Patents have ever been declared invalid by court order.

all five of the Bence Patents (beyond the two that PPC allegedly argued were invalid in the Arizona case).

And as to the argument that the two claim constructions successfully argued by PPC in the Arizona litigation render PVM's products non-infringing, none of the facts alleged in the Counterclaims make it plausible to conclude that no reasonable litigant in PPC's position could expect success in the instant litigation.[62] The alleged facts do make it plausible that, perhaps, PVM could prevail in this case. But the fact that PVM might prevail doesn't mean that PPC's suit is objectively baseless. For just one example, PVM alleges that the SignaLoc connectors discussed in paragraph 34 of the Counterclaims "do not include . . . [a] coupler that is attached to the body member, and/or . . . [a] body member that extends axially at least as far as the end of the post that receives the cable . . . ."[63] Even assuming that this is a factual allegation that must be accepted at this stage, nothing in the facts tells us whether the SignaLoc connector infringes under the doctrine of equivalents. In short, there is just not enough detail to plausibly suggest that the instant lawsuit is baseless.

But what about the second lawsuit in this District—concerning the '416 patent? The short answer is that PVM alleges no facts whatsoever about the second lawsuit in its Counterclaims. Without any supporting facts alleged to suggest baselessness or anticompetitive motivation, this second lawsuit doesn't make it any more plausible that PPC's actions satisfy Element Two of the monopoly claim.

---

[62] *See* Def.'s Countercls. (Doc. 20) ¶¶ 19–40, 45.

[63] *Id.* ¶ 34.

B.  **Attempted Monopoly**

A claim for attempted monopolization under Section 2 of the Sherman Act has three elements: "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success."[64] For all the reasons just provided in the last section, PVM does not plausibly allege facts to support the second element of this claim.[65] Accordingly, the Court need not analyze the first and third elements.

III.  **CONCLUSION**

For the foregoing reasons, PPC's Motion for Partial Judgment on the Pleadings (Doc. 34) is GRANTED. There is, however, a catch. It's a goose and gander issue. Because a Rule 12(c) motion can be used for what is essentially a Rule 12(b)(6) failure-to-state-a claim argument, the granting of a Rule 12(c) motion on these grounds should be subject to similar Rule 12(b)(6) relief. Had this been a Rule 12(b)(6) motion, the Court would surely have given PVM an opportunity to try and amend its Counterclaims to fix the deficiencies. The Court sees no reason not to do so now just because we are operating under Rule 12(c). PVM has 30 days from the date of today's Order to file a Motion for Leave to Amend its Counterclaims if it chooses to do so. Any such Motion must, of course, comply with the Federal and Local Rules. And PPC will be given 21 days to respond to the Motion, since we are around the holidays.

---

[64] *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987).

[65] The second element of an *attempted* monopolization claim—like the second element of a monopolization claim—requires proof of anticompetitive behavior. *See Trace X. Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 265–66 (8th Cir. 1984). And the showing of anticompetitive behavior required to withstand a Rule 12(c) motion is essentially the same regardless of whether the underlying claim is for monopolization or for *attempted* monopolization. *See id.* at 266 ("[A] mere showing of monopoly power unaccompanied by evidence of anti-competitive behavior is insufficient to support a claim for monopolization. Therefore, a conclusion that [the defendant's] activities were not anti-competitive would absolve it of liability under both [completed and attempted monopolization] claims."). In short, the Court's analysis of Element Two of PVM's monopolization claim, *see supra* pp. 8–12, applies with equal force to Element Two of PVM's attempted monopolization claim.

IT IS SO ORDERED this 10th day of December 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE